HARRY C. FISHER, Respondent, *v.* GUS HILL, Appellant.

First Department, May 1, 1925.

Contracts — action to recover royalties under contract granting defendant right of " dramatic representation " of " Mutt and Jeff "— plaintiff produced and licensed others to produce " animated cartoons " of same characters — royalties were paid for several years without objection to production of " animated cartoons "— plaintiff did not breach contract.

A contract authorizing the defendant to dramatize " Mutt and Jeff " and granting the defendant all the plaintiff's rights of " dramatic representation " of the same was not broken by the plaintiff, by himself producing and licensing others to produce " animated cartoons " of the characters " Mutt and Jeff " for use in motion picture theatres, for the production of " animated cartoons " does not amount to a " dramatic representation," and furthermore, the parties themselves have construed the contract against the defendant's contention, since it appears that for several years royalties were paid by the defendant without objection, notwithstanding he knew that the plaintiff was producing and had licensed others to produce the " animated cartoons."

APPEAL by the defendant, Gus Hill, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of New York on the 1st day of February, 1924, upon the decision of the court rendered after a trial at the New York Special Term, except in so far as said judgment dismisses that part of the complaint relating to equitable relief.

*Phillips, Jaffe & Jaffe* and *James A. Timony* [*Daniel Day Walton* of counsel; *Lemuel Bannister* and *Moses Jaffe* with him on the brief], for the appellant.

*Kelley & Becker* [*Charles E. Kelley* of counsel], for the respondent.

MARTIN, J.:

The first cause of action set forth in the complaint is for an accounting and an injunction, and the second is for damages. The defendant counterclaims for an accounting and for damages.

On February 20, 1911, the plaintiff and defendant entered into an agreement, in writing, of which the provisions now chiefly of interest are as follows:

" 1. The first party hereby assigns, transfers, conveys, grants and sets over to the second party all his right, title and interest in and to the right of *dramatic representation* of the said ' Mutt and Jeff ' which said rights are now owned by the first party, and which said transfer hereby made is to include any rights by renewals or otherwise that the first party now has or may have in and to said right of dramatic representation; and the first party further grants to the second party full right and privilege to use any and all

dialogue matter, names, etc., covered by said right of *dramatic representation*.

"The second party agrees to pay to the first party in consideration of the rights hereby granted, a sum equal to three per cent (3%) of the gross receipts of the second party from said dramatic production or productions.

"Said payment of three per cent shall be made at the end of each and every week and shall be made at the office of the first party at the Borough of Manhattan, City of New York, and shall be accompanied by duplicate box office statements signed by the Treasurer of the theatre in which said dramatic production shall be made."

In accordance with the agreement thus made, the defendant produced various "Mutt and Jeff" plays from the date of the contract up to the time of trial. They were known as musical comedies; and were produced by actors on the stage as distinguished from screen picture productions.

The defendant paid the royalty called for by the contract until September 30, 1919, when he refused to make further payments although he continued to produce the plays. The judgment for the sum of $23,864.39 is for unpaid royalties. The defendant questions plaintiff's right to recover any judgment whatever, but the points raised do not lead to a discussion as to the amount of the judgment recovered.

During the period beginning in 1916 and continuing up to the time of the trial, plaintiff produced and licensed others to produce what are known as "animated cartoons" of the characters "Mutt and Jeff." The character and manner of production is indicated by the following excerpt from the record: "The plaintiff either personally or with the assistance of other persons draws with pen and ink upon sheets of white paper, each approximately twelve inches square, a series of outline drawings depicting the said characters 'Mutt and Jeff' in various poses and positions; these drawings are then photographed, each drawing being photographed one or more times; the said photographs of the said drawings are then projected through a lens upon a screen in rapid succession, and when viewed upon the screen the said projections of the said drawings appear to move. Neither living actors, dummies, puppets or silhouettes are used in the manufacture of the said animated cartoons; but the same are produced entirely by means of pen and ink outline drawings."

One of these cartoons takes but three or four minutes to exhibit on the screen. None are based on defendant's plays.

By the terms of the contract defendant was granted the "right

of dramatic representation " and he claims thereunder the right to moving pictures and to animated cartoons. The plaintiff contends that neither moving pictures nor animated cartoons are dramatic representations, within the meaning of the contract.

The defendant largely relies upon cases involving interests in copyrights. But in this case there was no sale or transfer of copyrights. Copyrights are not involved and defendant's challenge as to the jurisdiction of the court, is without merit. The sole question here for review is the construction of a contract. (*Underhill* v. *Schenck*, 238 N. Y. 7.)

This case is also to be distinguished from those involving contracts expressing an intent to carry with the rights to dramatization the moving picture rights. A contract by which permission is given for dramatic representation does not necessarily imply that the right to produce moving pictures or animated cartoons is also granted. The contract must be examined to ascertain the intent of the parties.

Definitions of the word " drama " may be helpful in determining the meaning of the terms used in the contract:

"A composition, in prose or in poetry, usually intended to be acted upon the stage, presenting a story by means of characters speaking and acting in situations contrived to develop a plot, and with such accessories of scenery, stage machinery, costume, etc., as are fitted to produce an impression of reality; play." (See New Standard Dictionary.)

"A story put into action, or a story of human life told by actual representation of persons by persons, with imitation of language, voice, gesture, dress, and accessories or surrounding conditions, the whole produced with reference to truth or probability, and with or without the aid of music, dancing, painting, and decoration; a play." (See Century Dictionary.)

"A composition, in prose or poetry, accommodated to action, and intended to portray life or character, or to tell a story by actions and, usually, dialogue tending toward some result directly based upon them; a play. It is designed, or composed as though designed, to be performed by actors on the stage." (See Webster's New International Dictionary [1913].)

"A composition, in prose or verse, adapted to be acted upon a stage, in which a story is related by means of dialogue and action, and is represented with accompanying gesture, costume, and scenery, as in real life; a play." (See Murray's New English Dictionary.)

We must also consider the construction adapted by the parties themselves. In this connection it may be noted that for several

years defendant paid the royalties without asserting any rights to produce or exhibit moving pictures.

This subject has frequently been before the Federal courts where the rights of parties similarly situated have been under discussion.

In *Klein* v. *Beach* (232 Fed. 240; affd., 239 id. 108) the court said: " Not a word was written about motion pictures. It is argued that, if it was intended to exclude motion pictures, such exclusion would have been expressed. It may be urged with equal force that, if it was intended to include them, the inclusion should have been definitely stated. Klein, as the complaint points out, had achieved great fame as a dramatic author, and the product of his talent applied to the story of the novel was what Beach, Klein, and the manager proposed to present on the stage; but it does not follow that the contracting parties intended that there should be no grant by Beach of the motion picture rights to any one and that only stage performances with speaking actors could be given. * * *.

" The ' exclusive right to dramatize ' the novel ' for presentation on the stage ' merely meant that no one else was to be permitted to dramatize for the stage, but did not comprehend that Beach could not grant the right to another independently to dramatize the novel for the screen. Of course, ' stage ' is a comprehensive term. College commencements, public meetings, motion picture exhibitions take place on the physical structure called ' a stage '; but ' presentation on the stage ' in this contract surely means the spoken play.

" It is suggested that to hold that Beach retained the motion picture rights would violate the intent of the parties, because the motion picture would destroy or impair the commercial value of Klein's dramatic version, and that Klein and the others could not have contemplated such a result. I am far from satisfied that every motion picture interferes with the box office receipts from the same play on the dramatic or the operatic stage. I imagine that the motion picture ' Carmen ' will not outlast the living opera. * * *.

"And so it may well be, as I think was the case here, that the right to dramatize a novel for presentation on the stage does not necessarily carry with it all the motion picture rights. There is nothing in the reported cases to lead to any other conclusion.

" In the *Kalem Case* [*Kalem Co.* v. *Harper Bros.*, 222 U. S. 55] a contract was not being construed, but the court was dealing with the question as to whether one without authority could appropriate the essential features of a copyrighted work and produce them in a motion picture. The court held that such a production was dramatized within the meaning of the statute. No

one now questions that the moving picture may show a dramatization, and in the case at bar the presentation on the screen is a dramatization; but we are not dealing with definitions, but with the intent of the parties."

In the same case on appeal (239 Fed. 109) the court said: "The turning point in this case is the scope of the grant, whether by its terms it conferred upon Klein dramatic rights in the larger sense, including presentation, not only by living actors, but also by motion pictures, or whether it was limited to ' the stage ' proper. The actual words of grant are these: ' The sole and exclusive right to dramatize the said book for presentation on the stage.' * * *.

" There is no intimation that Klein should have further rights to make, not a play, but a motion picture scenario. Such a scenario is hardly a ' play ' for ' presentation on the stage.' We have this language to construe at a time when the different requirements of ' screen ' and ' stage ' were well understood, and with them the need of writing two quite separate kinds of dramatization. We see no reason in the face of that situation to suppose that the language was used out of its natural meaning, or in disregard of a well-established convention which was applicable."

In *Manners* v. *Morosco* (252 U. S. 317, 325) the United States Supreme Court said: " The thing granted was ' the sole and exclusive license and liberty to produce, perform and represent ' the play within the territorial limits stated, subject to the other terms of the contract. It may be assumed that those words might carry the right to represent the play in moving pictures if the other terms pointed that way, but to our mind they are inconsistent with any such intent. We need not discuss the abstract question whether, in view of the fact that such a mode of representation was familiar, it was to be expected that it should be mentioned if it was to be granted or should be excluded if it was to be denied. Every detail shows that a representation by spoken drama alone is provided for. The play is to be continued for seventy-five performances for the theatrical seasons named. This applies only to the regular stage. The royalties are adapted only to that mode of presentation."

After an examination of the contract, and considering the practical interpretation given it by the parties, and in view of what we conceive to be the trend of the judicial decisions on the subject, we have concluded that the contract should be construed in accordance with the contentions made by plaintiff and that the judgment should be affirmed, with costs.

CLARKE, P. J., MERRELL, FINCH and BURR, JJ., concur.

Judgment so far as appealed from affirmed, with costs.