THE KIRKE LA SHELLE COMPANY, Appellant, *v.* THE PAUL ARMSTRONG COMPANY et al., Respondents.

(Argued October 9, 1933; decided November 21, 1933.)

*Reese D. Alsop* for appellant. There should be implied in the settlement agreement a negative covenant on the part of the grantor that it will not use the ungranted portion of its estate in the play to the detriment of the interest assigned to the plaintiff. (*Harper Bros.* v. *Klaw & Erlanger*, 232 Fed. Rep. 609; *Manners* v. *Morosco*, 252 U. S. 317; *Underhill* v. *Schenck*, 238 N. Y. 7; *Frohman* v. *Fitch*, 164 App. Div. 231; *Reade* v. *Bentley*, 4 Kay & J. 656; *Pulte* v. *Derby*, 20 Fed. Cas. No. 11465; *Sweet* v. *Carter*, 11 Sim. 572; *Stevens* v. *Benning*, 1 Kay & J. 168.)

*Phelan Beale* for respondents. Equity will not imply a negative covenant unless it is indispensable to carry the intention of the parties into effect. (*Macloon* v. *Vitagraph, Inc.*, 30 Fed. Rep. [2d] 635; *Fisher* v. *Hill*, 212 App. Div. 646; *Klein* v. *Beach*, 232 Fed. Rep. 240; *Kalem Co.* v. *Harper Bros.*, 222 U. S. 55.)

HUBBS, J. This action was brought to recover one-half of the moneys received by respondents on a sale of the so-called " talkie " rights to the play or drama known as " Alias Jimmy Valentine " to the Metro-Goldwyn Mayer Corporation, on September 21, 1928.

" Alias Jimmy Valentine " is a dramatization by the

late Paul Armstrong, playwright, of the novel, " A Retrieved Reformation," by the late O. Henry. It was produced on the stage prior to 1914 in New York city and by road companies. It was thereafter let out to stock companies. Several years prior to September 21, 1928, the silent motion picture rights were assigned to the Peerless Features Producing Company, which rights, through subsequent assignments, had vested in Metro-Goldwyn Mayer Corporation before September 21, 1928, and silent motion pictures of the play had been exhibited throughout the United States by that corporation or its assignors.

Subsequent to September 21, 1928, Metro-Goldwyn Mayer Corporation used the play in " talkies " throughout the United States and Canada, and at the commencement of this action owned both the silent motion picture rights and the " talkie " rights.

In July, 1918, a judgment for $19,337.59, theretofore recovered by the appellant here against the playwright Paul Armstrong, was affirmed by this court (224 N. Y. 582). Just before the judgment was entered, Paul Armstrong died. Appellant attempted to recover from his estate and on finding it insolvent and that Armstrong had turned over practically all his plays and property to the respondent Paul Armstrong Company, brought suit against that respondent and Beale, who was Armstrong's attorney, to set aside the transfer on the ground that it was in fraud of creditors. That action was settled and discontinued on December 8, 1921, in accordance with the terms of a certain letter, written by attorneys for the appellant and addressed to and accepted by the attorney for the respondents. That letter provides for the discontinuance of the action, for the withdrawal of certain objections filed by the appellant in the Armstrong estate, for the assignment of the $19,337.59 judgment to the corporate respondent, and further reads as follows:

" We are to receive for our clients (all checks being

drawn to our order) one half of all moneys you are entitled to receive from any revivals of ' Alias Jimmy Valentine,' including productions in New York City, ' on the road ' or ' in stock ' from now on, throughout the United States and Canada.

" In case the moneys we receive as one half of all the moneys you are entitled to receive from revival production of ' Alias Jimmy Valentine ' by George C. Tyler, opening this evening at the Gaity Theatre, here in New York City, shall not amount to $19,337.59 * * * then we are to receive one half of all moneys you are or may be entitled to receive from any revivals of ' Salomy Jane,' including productions in New York City, ' on the road ' and ' in stock ' throughout the United States and Canada, from now on.

" This settlement is made on the understanding that all payments due us will be made direct to us from the producers or theatres under ' division orders ' filed with the producers, that you agree to file such orders promptly in all cases, that you will file such an order with Mr. George C. Tyler not later than December 9, 1921, and that all remittances are to be accompanied by box office statements.

" In making this settlement we feel we should state that it is in reliance * * * on the distinct understanding that all *contracts*, sales, licenses, or other arrangements to be made in the future affecting the title to the dramatic rights (exclusive of motion picture rights) to the above two plays or the production of the said plays in New York City, ' on the road ' or ' in stock ' will be submitted to us before execution or delivery and shall be subject to our approval."

The respondents, in accepting the terms of settlement in a letter to the appellant's attorneys stated that the agreement constituted an assignment of an interest in the plays. It appears that appellant received only about $1,000 from the revival at the Gaity Theatre of " Alias

Jimmy Valentine " and that, consequently, the appellant became entitled to share in the profits of " Salomy Jane." The parties have agreed that the profits from " Salomy Jane " as to which " talkie " rights have also been granted, shall be divided in the same way as that upon which the court shall finally decide for the division of the profits of " Alias Jimmy Valentine."

On September 21, 1928, the respondents granted to Metro-Goldwyn Mayer Corporation the exclusive " talkie " rights, so called, in the play, for which grant they received $15,000 less a commission of $1,500, to recover for one-half of which net amount this action was instituted.

The main question presented is whether, under the contract of settlement, appellant became entitled to share in the profits resulting from the grant of the " talkie " rights, so called, to the Metro-Goldwyn Mayer Corporation, either on the theory that they were included in the rights granted to appellant or on the theory that the sale was a direct violation of the covenant on the part of respondents to submit to the appellant for approval, before execution and delivery, all contracts to be made affecting the title to the dramatic rights of the play in question.

There is presented also the question as to whether there should be implied in the contract of settlement a covenant on the part of the respondents not to do anything to destroy or ignore appellant's rights under the contract, for a breach of which implied covenant the respondents have incurred liability for the resulting damage to be measured by one-half of the profits received by them.

It is conceded that at the time when the settlement agreement was entered into, " talkies " were unknown commercially and were, therefore, not in contemplation of the parties. It is not seriously contended on the part of the respondents that the grant of " talkie " rights and the production of sound pictures pursuant to that grant

did not affect to appellant's damage the value of production of the play on the stage in New York city, on the road and in stock. It is contended by respondents that the grant to appellant was limited to the presentation of the play on the stage in New York city, on the road and in stock, and that in view of the limited grant all other rights were retained by the respondents and were subject to their disposal without liability to appellant.

The trial court determined that the contract between the parties did not contemplate the production of the play in "talkies," as they were then unknown; that the contract could not be extended so as to give to the appellant a participation in moneys received by the respondents from sources other than revivals of the play; that when the appellant was given the right of approval of all contracts, sales, licenses or other arrangements to be made in the future affecting the title to the dramatic rights exclusive of motion picture rights, it was with respect to revivals of the play as then known and understood; that a negative covenant on the part of respondents not to dispose of the sound and dialogue rights for talking movies without appellant's approval is not to be implied, and that the agreement between the parties did not constitute them joint adventurers owing to each other a fiduciary duty because the relation of the parties was that of judgment creditor and judgment debtor.

We believe that this conclusion, though adopted by the Appellate Division, is erroneous. The parties to this action were not at any time in the relationship of judgment creditor and judgment debtor. It is true that the appellant, prior to the making of the contract, had a judgment against Armstrong, and that it was attempting to set aside a transfer of certain of his property to respondents on the ground that it was in fraud of creditors to the end that it might collect its judgment out of the property which it was asking to have returned to the judgment debtor's estate. It never recovered a judgment in the

action then pending. Its relationship with respondents is based on the contract in settlement of the pending action. Since "talkies" were unknown at the time when the contract was entered into, it cannot be said that "talkie" rights were within the contemplation of the parties either as a subject for the transfer of an interest therein to the appellant or as included in the motion picture rights specifically excepted.

There was granted, however, to the appellant the right to share in the profits resulting from the production of the play in question on the stage, on the road and in stock, and an express agreement on the part of the respondents not to enter into any contract affecting the title to the dramatic rights exclusive of motion picture rights or the production of the play in New York city, on the road or in stock without appellant's approval. That the contract with Metro-Goldwyn Mayer Corporation was a contract that would affect the production of the play; that it would diminish the value and affect the title to the interest in the dramatic rights contracted to the appellant is without question. To say that such covenant might be violated by the respondents without resulting liability to account to appellant would clearly be to acknowledge a right in appellant without obligation on the part of respondents to respond in damages for a breach of that right.

By entering into the contract and accepting and retaining the consideration therefor, the respondents assumed a fiduciary relationship which had its origin in the contract, and which imposed upon them the duty of utmost good faith. ( *Underhill* v. *Schenck*, 238 N. Y. 7.)

From the inclusion in the contract of the express agreement on the part of the respondents not to enter into any contract affecting the title to the dramatic rights, exclusive of motion picture rights, or the production of the play in New York city, on the road or in stock, without appellant's approval, may be implied the

obligation to hold the profits resulting from such breach for the benefit of the parties to the agreement in accordance with their rights under the contract.

It seems to us that the principles applied in *Harper Bros.* v. *Klaw & Erlanger* (232 Fed. Rep. 609) and *Manners* v. *Morosco* (252 U. S. 317) are applicable here. In the first case, Harper Brothers was assignee of the author and owner of the copyright as was the respondent company in the instant case. It gave to the defendant the exclusive right to produce on the stage one particular dramatization of " Ben Hur." Movie rights were unknown to the parties at the time of the agreement. Both plaintiff and defendant claimed the right, when movies became known, to use the rights possessed under the contract in motion pictures. While the Harper Brothers were owners of the copyright and had granted to the defendants the right to stage only a particular dramatization of the play, the court found that the motion picture tended to destroy the market for the play on the stage and while in strictness of law the movie rights might be owned by the owners of the copyright, a negative covenant was implied on the part of the owner of the copyright not to use the ungranted portion of the copyright estate to the detriment of the particular rights granted. The agreement was limited in the right conferred on defendant and there was no provision in the contract for submission of future agreements affecting the title to the dramatic rights or the production of the play to the defendants for their approval, as in the case at bar.

The court, under that state of facts, restrained each party from releasing a movie except by bargain with the other.

Here the Armstrong Company had the right to produce the play on the stage but one-half of the proceeds became the property of appellant. Had the contract with Metro-Goldwyn Mayer Corporation been one in contemplation rather than an executed agreement, the parties in this

case would have been in a similar position to that of the parties in *Harper Brothers* v. *Klaw & Erlanger* and, under that decision, the making of such a contract might have been restrained. The contract having been executed and a final benefit to respondents having resulted, appellant is entitled to its proportion of those benefits upon the basis of its share of the proceeds of the production provided for in the agreement, which production has been damaged by the granting of rights in derogation of the rights contemplated by the agreement. (*Underhill* v. *Schenck, supra.*)

In *Manners* v. *Morosco*, plaintiff was the author of a play and defendant was the producer. Motion pictures were known at the time. By the terms of the contract, they were neither expressly granted nor expressly excluded. The plaintiff was entitled to royalties to the extent of one-half of the proceeds of the exhibition of the play in stock. The question of the defendant's right to produce a motion picture version of the play having arisen, the plaintiff sought to enjoin the defendant. The court held that not only should the defendant be enjoined, but that the plaintiff was bound by an implied negative covenant not to give a moving picture of the play because to do so would tend to destroy the value of the rights he had granted to Morosco.

In the last analysis those cases only apply the principle that in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing. (*Wilson* v. *Mechanical Orguinnette Co.*, 170 N. Y. 542; *Brassil* v. *Maryland Casualty Co.*, 210 N. Y. 235.)

Respondents seek to distinguish those cases on the ground that the courts were not construing a contract, but dealing with a question of whether one without

authority could appropriate an essential part of a copyright. Those cases were decided not on copyright law, but on the law of contracts. In an attempt to distinguish those cases, we are referred to decisions such as *Fisher* v. *Hill* (212 App. Div. 646), where the production under consideration, and which it was contended violated the grant of a right of dramatic representation of caricatures copyrighted by the plaintiff, was the exhibition of animated cartoons, rather than living actors, which animated cartoons were not based upon the defendant's plays and did not constitute a dramatic representation, and *Klein* v. *Beach* (232 Fed. Rep. 240; affd., 239 Fed. Rep. 108), where plaintiff was a dramatist and defendant an author and they contracted together for a dramatization of a novel, the two together thereafter granting to a producer the exclusive right to produce the particular dramatization upon the stage, which rights had reverted to the parties before the commencement of the suit. There it was held that a negative covenant would not be implied to prohibit the defendant from selling the movie rights without first obtaining Klein's consent, the contract having been made at a time when movies were well known, and the decision preceding in point of time that in *Manners* v. *Morosco* (*supra*), in which later case a negative covenant was implied even though the contract was made at a time when movies were well known. Despite the refusal to imply a negative covenant, the court, in *Klein* v. *Beach* (*supra*), while holding that either party, their ownership of the drama being joint, could do with it what he pleased, also held that in the event of the licensing of Klein's dramatic version for the screen by either party, the obligation to account to the other would remain.

We are also referred to *Macloon* v. *Vitagraph, Inc.* (30 Fed. Rep. [2d] 634, 635), where the contract provided that " stock, motion picture and all other rights except the right of first class stage production limited to the

territory above mentioned shall remain in the owner." The action was not between the parties to the contract but between the assignee of the right of first class stage productions and the purchasers from the other party to the contract, which was not recorded, of the right to produce the play in talking moving pictures. There the court refused to imply a negative covenant on the part of the grantor not to use the ungranted portion of the copyright estate to the detriment if not destruction of the licensed estate because the defendant was an innocent purchaser for value without notice and the contract expressly reserved to the grantor not only the motion picture rights but also all other rights.

The court said: "By express provision the parties have rendered inoperative the beneficial rights which the appellant might otherwise have gained from the implied negative covenant within the rule announced in the cited cases."

While this court seems not to have passed upon a case involving substantially similar facts to those in the case at bar, the question has been before the Appellate Division in *Frohman* v. *Fitch* (164 App. Div. 231). In that case plaintiff was the producer of a play written by the defendant under exclusive grant of the right to produce the play in the United States and Canada. The contract was made at a time when moving pictures were unknown. The playright having died and his father having acquired his rights, the latter contracted with the American Play Company for a production of the play by means of moving pictures. The producer brought suit to enjoin the production of the play by moving pictures. The plaintiff contended that at the time the contract was entered into, neither of the parties contemplated production of the play by that means. The court held that even though it be conceded that neither of the parties had in mind the production of the play in that manner, it was a clear violation of the contract

to permit the play to be so produced; that since science had made it possible to produce the play in a manner not contemplated when the contract was entered into, it did not follow that the defendant could destroy the plaintiff's property or diminish the value of what he purchased. The only difference in the facts between that case and the one at bar is that here plaintiff owns but a half interest in the stage rights and there the plaintiff owned the entire stage rights, and that this case involves " talkies " while the other involved silent motion pictures.

It seems to us clear that having granted to appellant one-half of the benefits of the production of the play in the manner specified in the contract, there was an implied obligation on the part of the respondents not to render valueless the right conferred by the contract, especially in view of the fact that they breached the express covenant of the contract to refrain from making any agreement affecting the rights conveyed to appellant without its approval. Having breached the contract, they cannot be permitted to retain the full profits resulting from the wrong.

The judgment of the Appellate Division and that of the Trial Term should be reversed and judgment directed in favor of appellant against the respondents for one-half the net proceeds of the sale of the sound and dialogue rights together with interest thereon from the date of the sale, with costs in all courts.

POUND, Ch. J., CRANE, LEHMAN and KELLOGG, JJ., concur; O'BRIEN and CROUCH, JJ., dissent.

Judgment accordingly.