ERVIN J. MARES, Plaintiff, *v.* MALCOLM FOSTER, Defendant.

Supreme Court, Special Term, Nassau County, July 10, 1962.

*Nathaniel Taylor* and *Ward R. Burns* for plaintiff. *Krause, Hirsch, Gross & Heilpern* (*George J. Hirsch* of counsel), for defendant.

BERNARD S. MEYER, J. Plaintiff owned 49% and defendant 51% of the stock of Dispensers, Inc. Prior to the transactions in 1954 resulting in this ownership, the corporation had sustained losses resulting in a substantial carry-forward. On August 10, 1954, plaintiff, defendant and the corporation entered into a " stockholders " agreement, and on the same date a supplemental letter agreement was signed by defendant and approved by plaintiff and the corporation, providing that " to the extent there is any savings in income taxes to the Corporation by reason of the carry-forward loss which the Corporation now has, the payments to be made in repayment of FOSTER NOTE No. 2 (with the interest on such payments) shall be retained by me [defendant herein] ; all payments on said FOSTER NOTE No. 2 (with the interest on such payments) over and above any tax savings to the corporation by reason of the carry-forward loss which it now has shall be divided between you [plaintiff herein] and me in the same proportions as our respective stockholdings in the Corporation bear to each other."

Tax savings accrued to the corporation in years prior to 1957 to the extent of $14,183.75. On December 13, 1957, the corporation was dissolved in a proceeding instituted by defendant under section 103 of the General Corporation Law. In April, 1958, the receiver in that proceeding paid defendant $27,913.70 as principal and interest on Foster Note No. 2. In this action, plaintiff seeks to recover 49% of the $13,729.95 excess of the payment over the tax savings. Defendant pleaded affirmative defenses of *res judicata* and misrepresentation, but at the trial withdrew the misrepresentation defense.

At the trial the parties stipulated the amount of the tax savings and plaintiff proved that defendant received payment on April 18, 1958 of $27,913.70 and had paid no part of that money to plaintiff. Plaintiff moved to strike the defense of *res judicata,* and, the court having reserved decision on that motion, plaintiff rested. Defendant then introduced his original and supplemental petitions, with affidavits and exhibits, filed in the section 103 proceeding, the present plaintiff's answer in that proceeding, the Special Term orders thereon, and the Referee's report and supplemental report, together with the Special Term order confirming that report. Those documents, supplemented by the

concession that the corporation was actually dissolved in December, 1957, constituted defendant's case. Both sides moved for judgment. Plaintiff's motion to strike the defense of res judicata is granted and the Clerk is directed to enter judgment for plaintiff in the sum of $6,727.68 ($27,913.70 less $14,183.75 times 49%) with interest from July 9, 1958 (the date of service of summons, no earlier demand having been proved and the letter agreement specifying no definite time of payment), costs and disbursements.

The res judicata defense alleges that the carry-forward tax loss was available through 1958 but could not be used in 1957 or 1958 because of acts of plaintiff which resulted in an operating loss for the year 1957 and in the dissolution of the corporation prior to 1958, and that the Referee's report in the section 103 proceeding established that plaintiff's acts and conduct caused the 1957 loss and the dissolution of the corporation. The Referee's report found that a deadlock existed with respect to financing the operations of the corporation, as to the obtaining of new accounts, as to the refurbishing of equipment, as to the purchase of new equipment, as to advertising, inventory and labor relations. In so doing, the Referee noted that Mares had "rejected" Foster's plan for financing (but specified that the reason behind the rejection was beside the point), that Mares was "obdurate," "blocked any effort to get new business," "persisted" in his refusal to permit employees to refurbish equipment, "announced" that there were to be no purchases of new equipment, "eliminated" advertising entirely. While the Referee's choice of language strongly suggests his view that plaintiff Mares was the cause of the deadlock, he based no specific finding of motive (indeed, stated that in his view motive was irrelevant) on that language, but rather concluded from it, simply: "There can be no efficient management under such discordant conditions." Nor do the recitals at page 2 nor the findings at page 5 of Special Term's order of December 13, 1957 confirming the Referee's report refer in any way to defendant's motive. The court concludes, therefore, that the findings made by the Referee do not in fact establish bad faith on Mares' part in connection with the 1957 loss and the corporation's dissolution.

Were the court to accept the Referee's language as findings of bad faith, its conclusion would not be different, for bad faith on Mares' part was not a matter "comprehended and involved in the thing" (Pray v. Hegeman, 98 N. Y. 351, 358; see, also, Statter v. Statter, 2 N Y 2d 668) decided in the section 103 proceeding. Indeed the Referee's report correctly set forth the applicable law as follows: "What is required in a case under the statute is factual proof that a deadlock exists interfering

with corporate success and the efficiency of management and the dissolution must be for the benefit of the stockholders (*In Re Seamerlin Operating Co.*, 307 New York 417 [407]; *Matter of Cantelmo*, 275 App. Div. 231)." Defendant's reliance on language in *Matter of Cantelmo* (275 App. Div. 231, 233); *Matter of Whitehall Art Co.* (6 A D 2d 399, 400); and *Kavanaugh* v. *Kavanaugh Knitting Co.* (226 N. Y. 185, 193–196) as establishing that bad faith is an element to be found by a Referee in a section 103 proceeding is misplaced. Those cases establish that the *good* faith of the *petitioner* is in issue in such a proceeding, but not that the *bad* faith of the *respondent* has relevance. Obviously, a court of equity will not permit a petitioning stockholder to use the statute and the court as a means of obtaining the corporate business for himself. Just as obviously, if the petitioning stockholder is acting in good faith and the other necessary findings are made, the motives of the respondent in a section 103 proceeding will neither require nor proscribe judgment of dissolution.

It may be assumed that if the dissolution of the corporation had been brought about by plaintiff in bad faith, plaintiff's misconduct would constitute a defense to this action (cf. *Lorillard* v. *Clyde*, 142 N. Y. 456, 463–467; *Kirke La Shelle Co.* v. *Armstrong Co.*, 263 N. Y. 79, 87). Defendant has, however, put in no evidence on this issue other than the documents referred to. If the court were to consider the facts detailed therein separately from the defense of *res judicata*, it nonetheless could not conclude that there was bad faith or unfair dealing on Mares' part. Defendant's petition in the section 103 proceeding alleges (pars. 4, 14) that Mares refused to agree to *defendant's* suggestion that the corporation be dissolved and Mares' answer and affidavit in that proceeding show that he vigorously *opposed* judgment dissolving the corporation. Since Mares' investment was $24,500 and he was receiving a salary of $13,000 plus additional expense money and use of a car, it is difficult to conceive that he intentionally killed the corporation. Perhaps more complete evidence concerning his motives may have developed a reason for his so doing that would avail defendant in this action; the material before the court does not do so.

Finally, it is to be noted that defendant is not benefited by the rule stated in *Lorillard* v. *Clyde* (*supra*, p. 462) that "when performance depends on the continued existence of a given person or thing, and such continued existence was assumed as the basis of the agreement, the death of the person or the destruction of the thing puts an end to the obligation" for it cannot be said that the letter agreement contemplated the continued existence

of the corporation. By the letter agreement defendant bound himself to divide with plaintiff all payments received by defendant on Foster Note No. 2 except to the extent that the corporation benefited by tax savings resulting from the carry-forward. The evidence does not make clear, as did the evidence in the *Lorillard* case, the reason for the agreement. It may, perhaps, be inferred from the letter agreement that the " loan " evidenced by Foster Note No. 2 was in fact part of defendant's capital contribution but that defendant did not wish to contribute, both through that loan and in the form of the carry-forward, to the assets of the corporation. Such an inference is consistent with paragraph Sixth of the stockholders' agreement under which after 1955 Foster Note No. 2 was not to be considered a liability in computing book value, although the significance of the 1955 date is nowhere explained. But such an inference furnishes no basis for concluding that continuation of the corporate existence was a *sina qua non* of any payment by defendant to plaintiff under the letter agreement. Quite the opposite is to be concluded both from that inference and from the provision of the letter agreement that " *to the extent* there is any savings in income taxes to the Corporation " defendant was to retain the proceeds of the note. The letter agreement might, of course, have been so phrased as to make any payment to plaintiff turn upon the continued existence of the corporation, but this court may not " make a new contract for the parties under the guise of interpreting the writing " (*Heller* v. *Pope,* 250 N. Y. 132, 136; *Morlee Sales Corp.* v. *Manufacturers Trust Co.,* 9 N Y 2d 16, 19). Under the contract made by the parties, plaintiff is entitled to judgment.