■ BARCLAY ARMS, INC., Appellant-Respondent, v BARCLAY ARMS ASSOCIATES et al., Respondents-Appellants.—Order of the Supreme Court, New York County (Louis Grossman, J.), entered on January 14, 1986, which granted defendants' motion to dismiss the complaint to the extent of granting partial summary judgment dismissing that portion of the complaint alleging unilateral mistake by plaintiff and fraud by defendants, is affirmed, without costs or disbursements.

Regardless of whether or not the Supreme Court properly converted defendants' motion for dismissal of the complaint pursuant to CPLR 3211 to a motion for summary judgment under CPLR 3212, the fact remains that the complaint herein fails as a matter of law to state a claim for fraud. In that connection, the complaint alleges that on or about October 23, 1980, plaintiff entered into an agreement to transfer to Robert E. Waldron Associates, Inc. an interest in certain real property consisting of a land lease and apartment buildings constructed thereon and that Waldron Associates subsequently assigned its right, title and interest in the subject agreement to defendant Barclay Arms Associates. The complaint further asserts that "[b]y mutual mistake of the plaintiff and the defendants, or alternatively, by the mistake of the plaintiff and the fraud of the defendants in concealing their knowledge of the mistake, the * * * Agreement was incorrectly drawn and did not reflect the true understanding of the parties in that the plaintiff was to receive from defendant, Barclay Arms Associates, 25% of the 'Net Profits' realized by defendant, Barclay Arms Associates, upon the conversion of the Property and/or the Buildings to tenant-ownership, whether the form of ownership be cooperative or as a condominium." According

to the complaint, plaintiff executed the agreement in question believing that it set forth the true understanding of the parties and would not have done so if it had known that the agreement was not as actually agreed upon by the parties. Defendants thereafter converted the building to condominium ownership and refused to account for and pay to plaintiff the net profits due to him. It should be noted that the complaint also cites the relevant clause of the agreement, which provides, in part, that "[a]ny sums derived by [Barclay Arms] ASSOCIATES from the conversion to cooperative ownership * * * over and above the said cost shall be deemed 'Net Profits'."

The foregoing is the sum and substance of the complaint. While the allegations contained therein are adequate to state a cause of action for mutual mistake, nowhere are there any factual assertions which would support a claim for fraud. There is, for example, no contention that defendants engaged in any misrepresentations during the negotiations preceding the execution of the agreement, nor is there anything to show the existence of a joint venture between the parties or any other basis for the creation of a fiduciary relationship that would have required defendants to point out to plaintiff the omission of the word "condominium" in the writings, assuming that they were even aware of such omission. As this court declared in *National Westminster Bank v Weksel* (124 AD2d 144, 149): "It has, of course, long been the practice of the courts to require specificity in the pleading of fraud, and this practice has assumed statutory form in the CPLR 3016 (b) requirement that 'the circumstances constituting the wrong [i.e., fraud] shall be stated in detail'. The reason for this requirement is that the allegation of fraud necessarily raises a question respecting the subjective intent informing the charged party's conduct. (3 Weinstein-Korn-Miller, NY Civ Prac ¶ 3016.04; *Neiman v Felice, Inc.,* 55 AD2d 521.) Frequently, it is only through the objective circumstances of an alleged fraud that the subjective element of the tort is susceptible of demonstration. Thus, to state a cause of action for fraud, it is often critical that the circumstances of the tort be stated with sufficient specificity to permit the inference of fraudulent intent. Plainly, no cause of action for fraud is made out, nor can one be effectively answered and defended, when the subjective element is summarily alleged without supporting factual detail. *(See, Credit Alliance Corp. v Andersen & Co.,* 65 NY2d, at p 554.)"

Plaintiff's complaint is not only completely devoid of any

factual detail to sustain the general conclusory assertion of fraud, it does not even allege the existence of essential elements of a fraud claim, such as the misrepresentation of a material fact, falsity, scienter and deception (see, Gordon v De Laurentiis Corp., 141 AD2d 435 [1st Dept 1988]). Moreover, even considering the entirety of the record herein and not limiting our examination to the complaint itself, the facts demonstrate that plaintiff, perhaps because condominium conversions were then uncommon in the Borough of Queens, overlooked the possibility that defendants might convert the premises in question to condominium ownership, and defendants neglected to bring this option to plaintiff's attention. On the contrary, there is some indication that defendants themselves never entertained the notion of condominium conversion until after the agreement had been effectuated, and one of the individual defendants realized that by converting the property to a condominium the profits might not have to be shared with plaintiff. Thus, it appears that at some point following the execution of the agreement, defendants discovered a loophole therein, and, while their conduct might not have been particularly ethical, they chose to avail themselves of that loophole. Indeed, during the entire transaction, plaintiff was represented by an experienced real estate attorney, who himself prepared all of the operative writings. If defendants are purported to have committed a fraud upon plaintiff, the complaint—in fact, the whole record of this case—is totally lacking in any factual description as to the manner in which that fraud was supposed to have been perpetrated. Concur—Milonas, Rosenberger and Ellerin, JJ.

Ross, J. P., dissents in part in a memorandum as follows: I dissent in part. Accordingly, I would modify the order of Special Term, entered January 14, 1986, to the extent of reinstating the cause of action in the complaint which seeks reformation of a written contract, upon the basis that the unilateral mistake of the plaintiff in entering into that contract was induced by the fraud of the defendants, and otherwise affirm.

In 1980, Barclay Arms, Inc. (Barclay Arms), a New York corporation, owned an interest in certain real property, located in Jackson Heights, New York, which consisted of a land lease and the garden apartment complex constructed thereon (property). The president and majority shareholder of Barclay Arms is Mr. Frank Catapano (Mr. Catapano).

Late in 1980, Mr. Catapano discussed with Mr. Eugene DePasquale (Mr. DePasquale), who is a longtime friend of Mr.

Catapano and a sometime business associate, the advisability of converting the property from that of a rental to tenant ownership. At the time of this discussion, Mr. DePasquale was an employee of Cross & Brown, which is a major real estate firm, located in New York City. As a result of that conversation, Mr. Catapano placed the property for sale with Mr. DePasquale, as broker.

Thereafter, Mr. DePasquale introduced Mr. Catapano to Mr. Robert E. Waldron (Mr. Waldron), who was an associate of Mr. DePasquale at Cross & Brown, and who was interested in acquiring the property for conversion purposes.

Following negotiations between Mr. Catapano and Messrs. Waldron and DePasquale, pursuant to a written contract of sale, dated October 23, 1980, Barclay Arms sold the property to Waldron Associates, Inc. (Waldron Associates), and Mr. Waldron signed that contract as president of Waldron Associates. When the parties executed this October 23, 1980 agreement, they simultaneously executed an addendum to it. This addendum provided, in pertinent part, that: "In the event that the PURCHASER [Waldron Associates], its successors or assigns, or any owner of the Leasehold, shall within 12 years of Closing file a Plan to convey the property covered by the Leasehold to cooperative ownership, and such Plan subsequently becomes effective, then the PURCHASER shall pay to the SELLER [BARCLAY ARMS] an amount equal to 25% of the Net Profits derived from the sale of the apartments in the said Property".

Subsequently, on January 29, 1981, Waldron Associates assigned its interest in the property to Barclay Arms Associates (BAA), which is a New York partnership. Thereafter, on the same day as that assignment was made, Barclay Arms and BAA entered into an agreement, dated January 29, 1981 (Jan. 1981 agreement), whose terms were nearly identical to those contained in the addendum, in that it specifically provided that BAA shall pay Barclay Arms "an amount equal to 25% of the Net Profits derived from the sale of the apartments" if the property is converted "to cooperative ownership".

Approximately 2½ years after the execution of the January 1981 agreement, BAA converted the property to condominium ownership. Subsequently, BAA refused to pay Barclay Arms 25% of the net profits realized from the condominium conversion, on the ground that this form of tenant ownership was not covered by any agreement between the parties.

By service of a summons and complaint, dated February 7, 1985, Barclay Arms (plaintiff) commenced an action against partnership defendant BAA, and individual defendant Messrs. Waldron, DePasquale, Jerold I. Lupoff, Edward J. Dowling, Richard S. Pastore, Edward J. Okay, and Parker Reid, who are all partners of BAA, to reform the January 1981 agreement between plaintiff and defendant BAA, on the alternative grounds of mutual mistake or unilateral mistake of plaintiff, which was induced by the fraud of defendants BAA and the individuals named as defendants in the complaint (defendants). The mutual mistake cause of action alleges that the "January 29, 1981 Agreement was incorrectly drawn and did not reflect the true understanding of the parties [since] plaintiff was to receive from defendant [BAA] 25% of the 'Net Profits' realized by defendant [BAA] upon the conversion of the Property * * * to tenant-ownership, whether the form of ownership be cooperative or as a condominium". Furthermore, the alternative cause of action, unilateral mistake induced by fraud, alleges that the fraud consists of the defendants "concealing their knowledge of the mistake".

Instead of answering the complaint, the defendants moved, pursuant to CPLR 3211 (a) (7), to dismiss it for failure to state a cause of action. Plaintiff opposed. Special Term treated the defendants' dismissal motion as one for summary judgment, and, while it held that there was a triable issue of fact as to the cause of action alleging mutual mistake, it granted summary judgment to the defendants as to the cause of action alleging unilateral mistake induced by fraud.

It is hornbook law that the "[t]he function of summary judgment is issue finding, not issue determination *(Sillman v Twentieth Century-Fox Film Corp.,* 3 NY2d 395; *Allied Control Co. v C. F. A. Graphics,* 43 AD2d 678; *175 Check Cashing Corp. v Chubb Pac. Indem. Group,* 95 AD2d 701)" *(Pantote Big Alpha Foods v Schefman,* 121 AD2d 295, 296-297 [1st Dept 1986]). Furthermore, we have held that "[s]ummary judgment is a drastic remedy and should not be invoked where there is any doubt as to the existence of a triable issue *(Moskowitz v Garlock,* 23 AD2d 943, 944), or where the issue is even arguable *(Barrett v Jacobs,* 255 NY 520, 522)" *(City Univ. v Finalco, Inc.,* 93 AD2d 792, 793 [1st Dept 1983]).

Applying the legal authority, *supra,* to the instant case, in which neither an answer has yet been served nor discovery undertaken, I find Special Term erred in granting summary judgment, since there are triable issues of fact herein, which are discussed *infra.*

Mr. Catapano, in his capacity as president of plaintiff, submitted an affidavit in opposition to defendants' motion to dismiss. My review of that affidavit indicates that it contains facts which add support to the cause of action alleging unilateral mistake induced by fraud. Mr. Catapano states, in his affidavit, in pertinent part: "After the Plaintiff conveyed title to the Property to [BBA], DePasquale advised me that he had a conversation with Waldron concerning [BAA's] conversion of the Property to tenant ownership. DePasquale said that Waldron had discovered a mistake in the January 29 Agreement that gave [BAA] a loophole to avoid paying the Plaintiff 25% of the 'net profits' to be realized upon the conversation to tenant ownership. Waldron said that the January 29 Agreement only provided for a sharing of profits upon a conversion to cooperative ownership, and, therefore, [BAA] would convert the Property to condominium ownership, [and] avoid its obligation to the Plaintiff * * *. DePasquale said he told Waldron that Waldron's position was contrary to our agreement and Waldron said he did not care".

Although defendant Mr. Waldron contends in an affidavit that "I never told my partner, Mr. DePasquale, that there was any 'mistake' in the parties' agreement or made any suggestion that [BAA] would convert the subject property to condominium ownership so as to avoid any 'obligation' to [Barclay Arms]", and defendant Mr. DePasquale also contends in an affidavit that he never told Mr. Catapano "that my partner Waldron 'discovered a mistake' in the sales agreement or that [Mr. Waldron] found a 'loophole' * * * and I never at any time * * * indicated to Catapano that I thought * * * a condominium conversion was contrary to the agreement made with Catapano", I find those denials do nothing more than raise a triable issue of fact as to whether BAA converted the property to a condominium to avoid paying plaintiff 25% of the net profits. The Court of Appeals in *Glick & Dolleck v Tri-Pac Export Corp.* (22 NY2d 439, 441 [1968]) states "The court may not weigh the credibility of the affiants on a motion for summary judgment unless it clearly appears that the issues are not genuine, but feigned. *(Curry* v. *Mackenzie,* 239 N. Y. 267, 269-270)". Based upon my review of this record, I find no persuasive evidence, that indicates this issue is "not genuine" *(Glick & Dolleck v Tri-Pac Export Corp., supra,* at 441). Moreover, in considering a summary judgment motion "the court should draw all reasonable inferences in favor of the nonmoving party *(Robinson v Strong Mem. Hosp.,* 98 AD2d 276)" *(Pantote Big Alpha Foods v Schefman, supra,* at 297).

Since "the thrust of a reformation claim is that a writing does not set forth the actual agreement of the parties, generally neither the parol evidence rule nor the Statute of Frauds applies to bar proof, in the form of parol or extrinsic evidence, of the claimed agreement" *(Chimart Assocs. v Paul,* 66 NY2d 570, 573 [1986]).

Defendant Mr. DePasquale acknowledges that Mr. Catapano has been "my friend of many years standing". In addition, Mr. DePasquale admits that he brought defendant Mr. Waldron to the attention of Mr. Catapano. As mentioned *supra,* it was with his old friend, Mr. DePasquale, that Mr. Catapano first discussed the feasibility of converting the property to tenant ownership, and it was with defendant Mr. DePasquale, as broker, that Mr. Catapano placed the property for sale, since Mr. Catapano claimed, in his affidavit, that "DePasquale felt the Property was highly marketable to developers experienced in sponsoring conversions". My analysis of these facts leads me to find that there is a triable issue of fact as to whether a fiduciary relationship existed between the parties. In *Penato v George* (52 AD2d 939, 942 [1976], *appeals dismissed* 42 NY2d 908 [1977]), the court states: "[A] fiduciary relationship is one founded upon trust or confidence reposed by one person in the integrity and fidelity of another. It is said that the relationship exists in all cases in which influence has been acquired and abused, in which confidence has been reposed and betrayed. The rule embraces both technical fiduciary relations and those informal relations which exist whenever one man trusts in, and relies upon, another * * *. Such a relationship might be found to exist, in appropriate circumstances, *between close friends"* (emphasis supplied).

Even though New York State adopted the "Condominium Act" in 1964 *(see,* Real Property Law art 9-B), that fact does not refute Mr. Catapano's statement that, when he was negotiating the sale of the property with defendants Messrs. Waldron and DePasquale in late 1980, "condominium conversions were unheard of in Queens, where the Property is located". My examination of the record indicates that neither defendant Mr. Waldron nor defendant Mr. DePasquale denies the statement of Mr. Catapano about the sparsity of condominium conversions in Queens at that time. Based upon this evidence, I find that there is a triable issue of fact as to whether the term conversion to cooperative ownership, which, as mentioned *supra,* appears in the agreements, was intended to mean conversion to tenant ownership, regardless of the form it took.

More than 50 years ago, the Court of Appeals decided the case of *Kirke La Shelle Co. v Amstrong Co.* (263 NY 79 [1933]). In approximately 1921, the parties in the Kirke case entered into a written agreement, pursuant to which the plaintiff was to share in the profits earned from the sale by the defendants of the rights to produce a play, entitled "Alias Jimmy Valentine". Thereafter, in 1928, the defendants sold the "talkie" rights to that play to the Metro-Goldwyn-Mayer Corporation. After that sale, the defendants refused to share the profits with the plaintiff. As a result, the plaintiff commenced an action to recover a percentage of the sales price of the "talkie" rights. It was conceded that, at the time when the 1921 agreement was entered into, "talkies" were unknown commercially, and were, therefore, not in contemplation of the parties. The Court of Appeals held that the plaintiff was entitled to share in the proceeds from the sale of the "talkie" rights, since *(Kirke La Shelle Co. v Armstrong Co., supra,* at 87): "[i]n the last analysis * * * in every contract there is an implied covenant that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract, which means that in every contract there exists an implied covenant of good faith and fair dealing. *(Wilson* v. *Mechanical Orguinnette Co.,* 170 N. Y. 542; *Brassil* v. *Maryland Casualty Co.,* 210 N. Y. 235.)"

In my opinion the holding in the *Kirke* case *(supra)* is applicable to the instant set of facts, in view of my examination of the record, which indicates there is a question of fact as to whether condominiums were widely known in Queens, when the plaintiff and defendants were negotiating their January 1981 agreement. Therefore, I find there is a triable issue of fact as to whether defendants, by converting the property to condominium ownership, intended to deprive plaintiff of 25% of the net profits, and, as a result of this action, breached their "implied covenant [in the January 1981 agreement] of good faith and fair dealing" *(Kirke La Shelle Co. v Armstrong Co., supra,* at 87).

The attorney for the plaintiff prepared the addendum and the January 1981 agreement, and it is a long-established principle of contract law that "[i]n the event of doubt or ambiguity as to the meaning of the terms of a contract, the language must be construed most strongly against the party who prepared it" (22 NY Jur 2d, Contracts, § 228). But it is important to note that neither defendant Mr. Waldron nor defendant Mr. DePasquale, nor Mr. Catapano indicates the actual role of the attorney in the negotiations.

Defendant Mr. Waldron admitted, in his affidavit, that, as a consequence of BAA converting the property to a condominium instead of converting it to a cooperative, BBA's economic burden was increased, since it had to go "into the market to obtain new financing at prevailing market rates to discharge the outstanding mortgages prior to conversion". In view of that admission by Mr. Waldron, and the further concession by his appellate counsel, in oral argument in this court, that, while conversion to a cooperative would have retained the existing mortgages, the conversion to a condominium required new financing to be obtained at rates as high as 6% to 7% more than the existing mortgages, I find as another triable issue of fact, whether defendant BAA increased the economic burden to the tenant purchasers intentionally, in order to try to avoid paying plaintiff 25% of the net profits.

In summary, upon the basis of my analysis, *supra,* of the numerous triable issues of fact, I find that there was no justification for Special Term to grant summary judgment and dismiss the cause of action alleging unilateral mistake induced by fraud.

I find that to preclude the plaintiff from an opportunity to prove, if it can, that it was fraudulently induced to convey its property is premature, and perhaps unfair.

Accordingly, I would modify Special Term's order, and reinstate the cause of action for unilateral mistake induced by fraud.