OPINION OF THE COURT
Lorraine Miller, J.
Introduction
The tangled threads of intrigue and complex financial transactions concerning $6,580,150 in stolen funds from the plaintiff span two oceans and four continents, Interpol, IRS, United States Secret Service, United States Customs Service, the FBI, and the United States Drug Enforcement Agency, Federal and foreign tribunals and banking institutions all over the globe. This motion involves approximately $1,000,000 of those funds in New York.
Defendant Money Center Trust Co., Ltd. seeks, inter alia, to dismiss the complaint against it pursuant to CPLR 3211 (a) (1), (7), (8) and CPLR 327, to vacate the existing TRO, and to secure a denial of the attachment of part of that money in New York City banks sought by the plaintiff in a cross motion. Defendant Steve Global Services, a New Jersey corporation, with a Bronx, New York post-office box, moves to stay the litigation because of a Federal criminal indictment pending in New Jersey against it for conspiracy in conducting an unlicensed money transmitting business in violation of title 18 USC § 1956.
Background
Defendant Maria Fatima Chan (Chan) was employed in Macau by plaintiff, Banco Nacional Ultramarino, S. A., (BNU), a Portuguese government bank, as Manager of Trade Finance Operations. Between January and June 1995, Chan allegedly stole $6,580,150 by transferring funds from various BNU accounts in Macau into the accounts of Brigette Trading and Luen Hin Fat whose principals were part of the conspiracy perpetrating the alleged fraud. Those funds were then wired out of Macau to several locations throughout the world. It is undisputed that 19 of the wired transfers were processed through the Bank of New York (BONY), Citibank, and Bankers Trust Co. in New York City. Accounts maintained by defendants Money Center Trust Co., Ltd. (Money Center), a Nigerian company, and Steve Global Services (Steve’s), at BONY and Citibank, respectively, received deposits of $637,000 and $400,000 respectively from Brigette Trading and another entity *186 called Keymon International, both of which are controlled/ owned by one David Lok. In addition to the $400,000 in BNU funds transferred to the Money Center account via the wire transfers, Steve’s then transferred $100,000 of the BNU funds held in its Citibank account into Money Center’s BONY account in February 1995. The complaint alleges that Steve’s and Money Center were part of the conspiracy to defraud BNU, and that they converted the stolen BNU funds. The complaint also alleges a cause of action for unjust enrichment against these defendants as well as consequential and punitive damages, etc. In its decision and order of July 24, 1995, this court extended a temporary restraining order pertaining to Steve’s Citibank account No. 46929376, up to $637,000, and Money Center’s BONY account No. 6300581135, up to $400,000. The court reserved decision, pending further information, on plaintiffs request for an order of attachment with respect to those accounts.
Concurrent with the diversion of funds from BNU an investigation of Steve’s operations by the United States Department of Justice was underway. Two weeks after the hearing before this court on BNU’s motion for a TRO on the funds in the accounts in New York City, the United States Attorney filed an indictment against Steve’s principals, Steve Wangboje and Azie Guice, in the United States District Court in New Jersey. The indictment charged that they had engaged in "money laundering” of funds from narcotic operations, wire fraud and conspiracy. The affidavits of the United States Drug Enforcement Agency personnel in support of the orders for the interception of wire communications among the defendants indicated that the money laundering scheme was related to drug trafficking activities by car dealerships located in Nigeria. One such dealership was Skymit Motors, Ltd. in Lagos, Nigeria, to which Steve’s shipped luxury vehicles and parts. Communications intercepted from Wangboje’s home with the other defendants "reflect that the Subject[s] themselves are actively involved in fraudulent schemes * * * and have customers who were/are engaged in drug trafficking.” The wiretaps also revealed that Skymit attempted to impede the investigation in Nigeria by, inter alia, instructing Steve’s to manufacture and alter documents, and "stonewall” the investigators.
The extensive wiretap notes and summaries of the communications demonstrated that Wangboje knew that the wire transfers of money from Macau were illegal and that Skymit was implicated not only in the Macau fraud but in a Nigerian *187 bank fraud known locally as a "419” scheme (see, NY Times, Oct. 12, 1995, at A4). In June 1995 the Nigerian authorities shut Skymit down. The foregoing is but a brief outline of some of the facets of the various and complicated criminal activities involving Nigerian nationals and others that impact on the instant case.
Jurisdiction
The first issue raised by this motion is whether a basis exists for this court to exercise personal jurisdiction over Money Center. It is undisputed that this defendant is a finance company licensed by the Central Bank of Nigeria. Its principal place of business is in Lagos, Nigeria, and Money Center states that its sole nexus to New York and its sole asset here is the aforementioned BONY account through which it receives and disburses United States currency.
BNU argues that Money Center is subject to "long-arm” jurisdiction pursuant to CPLR 302 (a) (2) which provides that a court may exercise personal jurisdiction over a nondomiciliary who in person or through an agent, "commits a tortious act within the state”. Superimposed on all CPLR 302 "long-arm” jurisdiction inquiries is the requirement that to exercise such jurisdiction the nonresident defendant must at least have minimum contacts with the forum State "so that maintenance of the * * * suit” does not offend notions of "fair play and substantial justice”. (International Shoe Co. v Washington, 326 US 310, 320 [1945].)
In the instant case, it is undisputed that Money Center’s BONY commercial checking account was the conduit through which the fraudulent scheme advanced for two years. During that time numerous transactions took place in furtherance of Money Center’s financial services business although it contends that it did not conduct any foreign exchange transaction with any entity in New York. It did, however, elect to. utilize a New York banking institution and it admits that it directed Skymit to wire to its New York account the United States dollars it was purchasing from Skymit. This afforded defendant, Money Center, the protection of New York’s Banking Law and access to the extensive communications network available in this financial center which make transfers of foreign currency by wire possible and routine. Additionally, that account is directly related to the causes of action asserted by plaintiff. Thus, in this court’s view sufficient contacts exist so that the constraints of the International Shoe Co. case (supra) are satisfied.
*188 The allegation that Money Center used its BONY account to receive and transfer the stolen funds, thus converting the money, satisfies the statutory requirement that the tort occur within the State. However it is contended that New York courts previously interpreted CPLR 302 (a) (2) to require that in addition to committing the tortious act in New York, defendant, or his agent, must be physically present in the State. (See, Feathers v McLucas, 15 NY2d 443 [1965]; McLaughlin, Practice Commentaries, McKinney’s Cons Laws of NY, Book 7B, CPLR C302:17, at 103-104.) Money Center further argues that New York courts have not sustained jurisdiction where defendants made misrepresentations in letters mailed from without the State. (See, Bauer Indus. v Shannon Luminous Materials Co., 52 AD2d 897 [1976].)
There are two distinguishing factors which make Feathers (supra) inappropriate and inapplicable in the view of this court. First, assuming the truth of the allegations, Money Center is accused of having committed an affirmative act in New York, money laundering, via instructions conveyed to BONY. (See, Pilates, Inc. v Pilates Inst., 891 F Supp 175 [SD NY 1995].) Second, to allow a defendant to conspire and direct tortious activities in New York, in furtherance of that conspiracy, and then avoid jurisdiction because it directs those activities from outside the State or country, is to ignore the reality of modern banking and computer technology in the end of the 20th century! A defendant with access to computers, fax machines, etc., no longer has to physically enter New York to perform a financial transaction which may be criminal or tortious, i.e., conversion. He may secrete himself and/or direct activities from locations where jurisdiction may be impossible to acquire, including a boat beyond the three-mile limit. Thus, the emphasis should be on the locus of the tort, not whether defendant was physically here when the tortious act occurred. Once the court finds that the tort occurred within the State, it should look at the totality of the circumstances, to determine if jurisdiction should be exercised under CLPR 302 (a) (2) (see, Parke Bernet Galleries v Franklyn, 26 NY2d 13 [1970] [which held that a telephone call during an auction from a buyer outside New York was sufficient to create an agency relationship to the gallery’s employee]). Having found that the tort occurred within New York the court concludes that defendant’s bodily presence is not an indispensable requirement for long-arm jurisdiction. It would be a travesty to permit the use of our institutions to channel stolen funds and/or the proceeds from *189 heroin sales by those who impudently claim they are beyond our borders! It would be a gross violation of common sense and reality to shelter such activities.
Attachment
The court finds that an order of attachment, for the dual purpose of security and the assertion of quasi-in rem jurisdiction over Money Center, is also appropriate in the instant case. As has been discussed supra, defendant has sufficient contacts with New York to satisfy the constitutional imperatives. (See also, Banco Ambrosiano v Artoc Bank & Trust, 62 NY2d 65 [1984]; Majique Fashions v Warwick & Co., 67 AD2d 321 [1979].) Additionally, there is no doubt that the statutory requisites of CPLR 6201 have been met. BNU is seeking money damages and Money Center admits it "is a foreign corporation not qualified to do business in the state”. (CPLR 6201 [1].) However, as with all provisional remedies, plaintiff is required to demonstrate that it is likely to prevail on the merits. (See, North Georgia Finishing v Di-Chem, Inc., 419 US 601 [1975].)
Money Center’s defense is that it knew nothing of the illegal activities of Steve’s, Skymit or Chan. However, wrongful intent is not an element of a cause of action in conversion. (Pokoik v Gittens, 171 AD2d 470 [1991]; General Elec. Co. v American Express Isbrandtsen Lines, 37 AD2d 959 [1971].) It is sufficient that plaintiff plead and establish that defendant used plaintiffs property without right or title thereto. (Pokoik v Gittens, supra.) There is sufficient documentary proof that plaintiff’s funds were deposited into Money Center’s BONY account and that Money Center transferred those funds as part of a business transaction in United States currency. Thus, having demonstrated that a cause of action for conversion exists, which is supported by evidentiary facts and documents, plaintiff has met its burden (see, Richman v Richman, 41 AD2d 993 [1973]), and the provisional remedy of an order of attachment is warranted on BONY account No. 630058113J.
Fraud
The second part of Money Center’s motion seeks dismissal of the complaint for failure to state a cause of action. On a motion to dismiss, pursuant to CPLR 3211 (a) (7), the court must accept the allegations in the complaint as true and afford plaintiff every favorable inference which may be drawn from those allegations. (See, Guggenheimer v Ginsberg, 43 NY2d 268, 275 [1977].) Money Center argues that the complaint does not *190 state one of the requisite elements of a cause of action sounding in fraud, to wit, there is no allegation that Money Center made a material misrepresentation of a material fact to BNU. (See, Barclay Arms v Barclay Arms Assocs., 144 AD2d 287 [1988].) Additionally, defendant states that the complaint does not set forth the allegations with the particularity required by CPLR 3016 (b).
However, an allegation of fraud may be based on "an act or conduct by defendant” that is intended to deceive plaintiff. Concealment of facts one has an obligation to disclose with the intent to defraud has the same legal effect as an affirmative misrepresentation. (See, Quadrazzi Concrete v Mastroianni, 56 AD2d 353 [1977].) Here, the complaint alleges that Money Center was part of the conspiracy to defraud BNU which began in Macau with Chan’s misappropriation of the $6.5 million. The heart of the allegation is that Money Center willingly took part in a phase of the conspiracy. Money Center’s financial links to Steve’s, Keymon and Skymit are clear. There is a strong indication that those three entities were involved in a money laundering scheme that included the purloined BNU funds.
Money Center claims it had no knowledge or reason to know that the source of the funds deposited in its BONY account was the product of wrongdoing by Chan. However, some of its actions and averments negate that protestation. On one hand it disavows all knowledge of Steve’s or Skymit’s wrongdoing, but acknowledges that these are the entities wiring money into its account. The explanation that this was done at Skymit’s request appears contrived and after the fact. The wire transfers documenting the transactions do not indicate that the transferred funds were for Skymit’s benefit.
Also appearing irregular is the way in which Money Center handled the funds at issue here. Money Center contends that one of its primary functions is to purchase dollars for its subsidiary Bellview Airlines, in exchange for Naira (the local Nigerian currency). Bellview is the second largest airline in Nigeria, and it is paid in Naira. Bellview requires hard currency to pay its suppliers, international fees and charges. Money Center received $600,000 from Skymit. It transferred $424,965 to a separate account held by Bellview at BONY. It did not exchange this money for Naira. Instead, it appears from the BONY-Belleview bank statement that Bellview used most of the funds in its BONY account to pay its suppliers, etc., and transferred Naira from its Nigerian bank accounts to Skymit. No explanation is offered for that transfer.
*191 Of the remaining monies, Money Center transferred a total of $100,000 to two European banks designated by Skymit. Money Center again offers a curious explanation for this transaction. It states that Skymit wished to sell more currency than Money Center wished to purchase. Therefore, it received all the funds and disbursed the excess in accordance with Skymit’s instructions to facilitate the over-all exchange. What is curious is that Steve’s held $100,000 on Skymit’s behalf. Yet Steve’s was not instructed to transfer these funds directly to the European companies, and eliminate the middle transaction.
Finally, there are two other items that indicate that Money Center was not duped into participating in the money laundering scheme but was a knowing participant. First is the reference to Money Center in the DEA summaries of the wire taps monitoring the conversations between Skymit’s principal, Tayo Ayeni, and Steve’s principal, Steve Wangboje. The summary states: "They discuss the guy with the Money Center, Mr. Ogbege [sic] and Skymit.” Second is the conclusion stated in the "Letter Of Request for the Apprehension of Funds” from the Criminal Investigation Court of Macau which states, inter alia, referring to the Money Center BONY account, "upon the holder[s] of those accounts exist strong suspicion of having received such funds, being well aware were originated of criminal activities”. Taken as a whole there is enough to rebut a motion to dismiss.
The court also notes that at this stage of the litigation, where the circumstances constituting the fraud and the conspiracy are within the knowledge of the alleged coconspirators, BNU is not required to prove its allegations, but merely offer some factual support of its contention that a basis exists for this cause of action. (Jered Constr. Corp. v New York City Tr. Auth., 22 NY2d 187 [1968]; see also, P.S. Auctions v Exchange Mut. Ins. Co., 105 AD2d 473 [1984].) As stated, BNU has met its burden.
Money Center’s attack on the sufficiency of the cause of action for conversion has been dismissed previously by the court. Money Center’s defense that it was a "holder in due course” is not applicable to this action. (See, Fazio v Loweth, 112 AD2d 135 [1985].) Additionally, defendant’s argument to the contrary, the money at issue here is a specific identifiable fund (Payne v White, 101 AD2d 975 [1984]), and it is of no consequence that it has subsequently been transferred out of the BONY account. This is not a replevin action, but one for money *192 damages. (See, Sager v Blain, 44 NY 445 [1871].) For the same reasons applicable to the conversion claim, the cause of action alleging unjust enrichment is also sufficient. (See, Simonds v Simonds, 45 NY2d 233 [1978]; Mente v Wenzel, 178 AD2d 705 [1991].)
Money Center’s motion pursuant to CPLR 327 seeking dismissal of the complaint on grounds of forum non conveniens is also denied. The doctrine is applied if notions of justice, fairness and convenience require it. Among the factors the court must consider are (1) the availability of another more convenient forum; (2) whether the dispute centers around a transaction occurring primarily in another jurisdiction; and (3) whether the foreign jurisdiction has a permanent interest in resolving the issues. (Irrigation & Indus. Dev. Corp. v Indag S. A., 37 NY2d 522 [1975]; Silver v Great Am. Ins. Co., 29 NY2d 356 [1972]; Hart v General Motors Corp., 129 AD2d 179.) No one factor is controlling. (Islamic Republic of Iran v Pahlavi, 62 NY2d 474 [1984]; Banco Ambrosiano v Artoc Bank & Trust, supra.)
Clearly the scheme to defraud BNU was a multinational effort with money flowing from Macau via the 19 wire transfers into accounts of various codefendants in New York banks. Thus, New York became the hub of defendant’s activities, and New York banking institutions the means of disbursement. Underpinning the complaint is the allegation that these defendants were part of a conspiracy to defraud BNU. Proof of such conspiracy requires the linking together of the acts of various defendants like the hub of a wheel with many spokes. Allowing defendants to defend in the Nigerian courts would undermine plaintiff’s ability to marshall such proof. Additionally, plaintiff would lose the use of the procedures for discovery allowed in this jurisdiction. In sum, defendant has not demonstrated that plaintiffs choice of forum is inappropriate (Banco Ambrosiano v Artoc Bank & Trust, supra), and the interests of justice will be better served by retaining jurisdiction in New York.
BNU’s cross motion for further discovery, to compel Money Center to produce a witness with knowledge for deposition is granted. Kayode Odukoya, Money Center’s principal in Nigeria, argues that his appearance in New York for a deposition would involve significant inconvenience and expense. (See, Levine v St. Luke’s Hosp. Ctr., 109 AD2d 694 [1985].) Plaintiffs motion is granted to the extent that it has the option of proceeding by letters rogatory, travelling to Portugal (because *193 of dangerous conditions existing in Nigeria) to hold the deposition, or conducting the deposition in New York 30 days before the trial of this matter in New York. Plaintiff shall give counsel for Money Center 30 days’ notice from date hereof of its choice.
Defendant, Steve’s, separately moves herein for an order staying the instant litigation pending the resolution of the related criminal case in New Jersey against its principals. (CPLR 2201.) That motion is granted. Discovery by BNU would not be possible for Steve’s principals would invoke their Fifth Amendment rights while the extensive indictment against them is extant. (United States v All Assets of Statewide Auto Parts, 971 F2d 896 [2d Cir 1992]; United States v Puello, 814 F Supp 1155 [ED NY 1993]; United States v Rodriquez, 498 F2d 302 [5th Cir 1974].) The TRO restraining the funds maintained in Citibank account No. 46929376, up to $637,000, remains in full force and effect. BNU’s informal request to stay these proceedings against all defendants is denied, without prejudice to a subsequent motion based upon proper grounds. At this juncture discovery by plaintiff’s new counsel is to continue against the remaining named defendants who have appeared herein and a compliance conference is scheduled for June 27, 1996.
Accordingly, Money Center’s motion to dismiss the complaint is denied. The cross motion is granted, to the extent indicated herein. The motion to stay these proceedings with respect to defendant Steve’s is granted. (See, Zonghetti v Jeromack, 150 AD2d 561 [2d Dept 1989]; Brock v Tolkow, 109 FRD 116 [ED NY 1985].)