Korea Inv. & Sec. Co., Ltd. v Seabury Capital Group LLC (2025 NY Slip Op 51098(U))

[*1]

Korea Inv. & Sec. Co., Ltd. v Seabury Capital Group LLC

2025 NY Slip Op 51098(U)

Decided on July 14, 2025

Supreme Court, New York County

Chan, J.

Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.

This opinion is uncorrected and will not be published in the printed Official Reports.

Decided on July 14, 2025
Supreme Court, New York County

Korea Investment & Securities Co., Ltd., AS TRUSTEE OF ARUMDREE AI PRIVATE INVESTMENT TRUST NO. 7 AND ARUMDREE AI PRIVATE INVESTMENT TRUST NO. 9, Plaintiff,

against
Seabury Capital Group LLC, SEABURY CAPITAL LLC, SEABURY TRADE FINANCE EXCHANGE LLC, SEABURY TRADE CAPITAL SPC, SEABURY TFX (HK) LIMITED, SEABRIDGE HOLDING PTE. LTD., BILLBOARD TFX PTE. LTD., RIVERTWEED CO., LTD., MARGARET L. CHAN, ROBERT C. M. LIN, FONG NGAN SENG, GLENN GOH, SEOKWON JANG, and DOES 1 THROUGH 20, INCLUSIVE, Defendants.

Index No. 653101/2024

Counsel for Plaintiff: Yong Ik Lee of Jipyong LLC and Melissa M. Carvalho and Brittany A. Yantis of Baker & Hostetler LLP
Counsel for Defendants Seabury Capital Group LLC, Seabury Capital LLC, Seabury Trade Finance Exchange LLC, Seabury Trade Capital SPC, Seabury TFX (HK) Limited, Seabridge Holding Pte. Ltd, Billboard TFX Pte. Ltd., Margaret L. Chan, and Robert C. M. Lin: Stan Chelney and Philipp Smaylovsky of Chelney Law Group PLLC
Counsel for Defendants RiverTweed Co., Ltd and Sukwon Jang: Lawrence W. Andrea of Kim & Bae, PC

Margaret A. Chan, J.

The following e-filed documents, listed by NYSCEF document number (MS002) 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 59, 60, 61, 62, 63, 64, 65, 66, 67, 68, 69, 70, 83, 85, 87, 90, 91, 92, 93, 94, 95, 96, 97, 98, 99 were read on this motion to/for DISMISSAL.
The following e-filed documents, listed by NYSCEF document number (MS003) 54, 55, 56, 71, 72, 73, 74, 75, 76, 77, 78, 79, 80, 81, 82, 84, 86, 88 were read on this motion to/for DISMISSAL.
Plaintiff Korea Investment & Securities Co., Ltd. (plaintiff), acting as Trustee of [*2]Arumdree AI Private Investment Trust No. 7 and Arumdree AI Private Investment Trust No. 9 (the Trust Fund), brings this action against defendants Seabury Capital Group LLC (Seabury Group), Seabury Capital LLC (Seabury Capital), Seabury Trade Finance Exchange LLC (Seabury Trade), Seabury Trade Capital SPC (SPC), Seabury TFX (HK) Limited (Seabury Hong Kong), Seabridge Holding Pte. Ltd. (Seabridge Holding), Billboard TFX Pte. Ltd. (Seabridge Trade), RiverTweed Co., Ltd. (RiverTweed), Margaret L. Chan (Chan), Robert C. M. Lin (Lin), and Seokwon Jang (Jang) (collectively, defendants),[FN1]
asserting claims in connection with a multinational investment project in which plaintiff invested $39.5 million (NYSCEF # 1 — compl or Complaint). Presently before the court are two motions. In Motion Sequence 002 (MS002), defendants Seabury Group, Seabury Capital, Seabury Trade, SPC, Seabury Hong Kong, Seabridge Holding, Seabridge Trade, Chan, and Lin (collectively, the Seabury Defendants) move for an order dismissing the Complaint pursuant to CPLR 327(a) and CPLR 3211(a)(1), (a)(7), and (a)(8) (NYSCEF # 30). And in Motion Sequence 003 (MS003), defendants RiverTweed and Jang (together, the RiverTweed Defendants) move for an order dismissing the Complaint pursuant to CPLR 327(a) and CPLR 3211(a)(7) and (a)(8) (NYSCEF # 54). Plaintiff opposes both motions. For the foregoing reasons, the motions are granted.
Background [FN2]
The Trust Fund's Subscription to the Notes
In or around May 2019, Jang, a resident of South Korea acting in his capacity as a director for RiverTweed, a company incorporated in South Korea with its principal place of business in Seoul, approached Arumdree, the then-manager of the Trust Fund (compl ¶¶ 5, 24). The purpose of Jang's outreach was to solicit an investment in a multinational investment project involving certain trade receivables held by Agritrade International Pte Ltd. (AIPL), a Singaporean commodities company (the Project) (compl ¶¶ 1, 13, 18, 24; NYSCEF # 56 — Jang aff ¶¶ 4-5). Jang's outreach resulted in Arumdree visiting Singapore between May 9, 2019, and May 11, 2019, to explore the Project (compl ¶ 24).
While in Singapore, Arumdree met with Lin, a United States national currently residing and working in Hong Kong who served as the President and Chief Executive Officer (CEO) of (1) Seabury Trade, a holding company organized under the laws of Delaware and a wholly owned subsidiary of the New York-based Seabury Capital, and (2) Seabury Hong Kong, a Hong Kong-based operating company in which Seabury Trade holds an interest (see id. ¶¶ 7-8, 10, 15, 24; NYSCEF # 33 — Lin aff ¶¶ 2-5).[FN3]
Lin then invited Arumdree to AIPL's office to meet with AIPL's representatives, and he further arranged meetings with AIPL's customers (compl ¶ 24). It was during Arumdree's visit that Lin, Jang, and AIPL's then-Chief Operating Officer (COO), Fong Nang Seng (Fong), allegedly represented that the Project would be a great investment opportunity with Lin in charge of managing any such investment (see id. ¶¶ 24, 26-27).
On May 11, 2019, following Arumdree's visit, Jang sent Arumdree attaching AIPL's 2018 Consolidated Financial Statements, which indicated that AIPL had more than $113 million in net assets as of 2018 and would be able to pay its debts when due (compl ¶ 25). Two days later, on May 13, 20219, Jang forwarded an email from Lin attaching 70 documents that related to AIPL's past transactions with another purported customer (id. ¶ 26).
On May 21, 2019, and June 20, 2019, respectively, and presumably based on the representations and documents Arumdree received, plaintiff subscribed to the following two notes offered by SPC, a Cayman Island-based segregated portfolio company: (1) the Series 2019-2 USD 20,000,000 Secured Fixed Rate Notes due 2020 (the SPC2 Note), and (2) the Series 2019-3 USD 19,540,000 Secured Fixed Rate Note due 2020 (the SPC3 Note, and together with the SPC2 Note, the Notes) (see compl ¶¶ 9, 31; Lin aff ¶¶ 8-9). Concurrent with the Notes, plaintiff executed a corresponding Subscription Agreement on behalf of the Trust Fund (the Subscription Agreement) (see compl ¶ 31; see, e.g. NYSCEF # 37). As relevant here, the Subscription Agreement, and "any non-contractual obligations arising out of or in connection with" the agreement, is governed by English law (see NYSCEF # 37 § 12.1).
The Project in which the Trust Fund subscribed was structured in the following manner. First, plaintiff would transfer $39,540,000 of the Trust Fund's funds to SPC (compl ¶¶ 33, 36). Second, using a platform hosted by Seabury Hong Kong, SPC would use the proceeds from the Notes to purchase AIPL's trade receivables (the Purchased Receivables), which would then entitle SPC to payments from certain AIPL customers (the Approved Debtors) (id. ¶¶ 34, 36). Third, Seabury Hong Kong would manage the Purchased Receivables by requesting and reviewing necessary documents from AIPL and the Approved Debtors (id. ¶ 34). Finally, on or before the Notes' maturity dates, SPC would pay back the Trust Fund the full amount of its purchase price of the Notes, with interest (id. ¶¶ 35-36).
As a purported protection for any investment in the Project, AIPL's then-CEO, Ng Xinwei (Ng) guaranteed payment, on demand, of the full amount of all obligations or indebtedness owed from AIPL (compl ¶ 37). The Project was also allegedly backed by certain trade credit policies insuring the Purchased Receivables (id.). The policies were underwritten by Hong Kong-based insurance companies, with SPC listed as the "loss payee" (NYSCEF #s 91-96).[FN4]

AIPL's Fraud is Exposed and Plaintiff Loses Much of Its Investment
In the initial months following plaintiff's subscription to the Notes, there was no indication of an issue with AIPL and, by all accounts, the Trust Fund's investment was proceeding as originally contemplated (see compl ¶¶ 38-41). That all changed on January 16, 2020, when AIPL applied for a moratorium under Section 211B of Singapore's Companies Act (id. ¶ 42). Soon after, AIPL was placed under judicial management at the request of creditors, with Ernst & Young LLP (E&Y) appointed as judicial manager (id.).
On August 7, 2020, E&Y filed its judicial manager report with the Singapore High Court (compl ¶ 43; NYSCEF # 72). The report identified numerous irregularities and conflicts of interest underlying AIPL's business and accounting practices (compl ¶ 43). The report also [*3]revealed that AIPL had been experiencing severe liquidity problems for years and had been attempting to procure loans from banks and other financial institutions using forged documents and false information (id. ¶ 45). In plaintiff's view, the Project was an extension of AIPL's fraud because it was able to use the ill-gotten gains from the Trust Fund to pay off its mounting debts and/or shield its wrongdoing (see id. ¶¶ 44-45, 47). Subsequent criminal investigations into AIPL and its executives seemingly corroborated and expanded upon this revelation of fraudulent conduct (see id. ¶ 49).
AIPL was ultimately wound up by court order on September 21, 2020 (compl ¶ 49). Three years later, on August 17, 2023, Arumdree emailed Lin to inquire about (1) what measures were being taken against the Approved Debtors to recover the Purchased Receivables, and (2) why Seabury Hong Kong had not commenced proceedings against AIPL and the Approved Debtors for fraudulent conspiracy (compl ¶ 50). Lin responded on August 25, 2023, stating that, outside of demand notices served on the Approved Debtors, no other actions were taken against them (id.). Lin further represented that there were no plans to commence proceedings against AIPL or the Approved Debtors (id.). Two months later, on October 16, 2023, Arumdree instructed "Seabury"[FN5]
to withdraw and return the remaining funds in SPC's account (id. ¶ 51). On December 19, 2023, "Seabury" transferred to the Trust Fund $43,644.05 from the SPC2 Note's account and $316,409.941 from the SPC3 Note's account (id.).
Defendants' Alleged Conspiracy to Defraud Plaintiff
Plaintiff maintains, upon information and belief, that the Project was a product of defendants acting in concert to defraud plaintiff (compl ¶¶ 24, 28-30, 46, 52, 58). As alleged, Lin and Jang were in constant communications with Fong while attempting to solicit Arumdree's investment in the Project (id. ¶ 24). Specifically, Jang's social media messages indicated that these three individuals discussed specific terms of the Project such as deal structure, interest rates, insurance policies, payment dates, and the amount of the notes to be sold (id. ¶ 28). Meanwhile, plaintiff continues, Chan—a California resident based out of Los Angeles who is the President and COO of Seabury Capital, a board member of various affiliates of the New York-based Seabury Group and its subsidiary Seabury Capital, a Vice-Chairman of Seabury Hong Kong, and a director of SPC (see NYSCEF # 32 — Chan aff ¶¶ 1-2)—was purportedly "actively involved" in structuring the Project and gave directions regarding its funding (see compl ¶ 29). Plaintiff then notes that RiverTweed and Seabridge Trade, a Singapore-incorporated company,[FN6]
were paid a commission from Seabury Hong Kong for arranging the Project (compl ¶¶ 12, 30; see also Jang aff ¶ 12).
According to plaintiff, defendants carried out their scheme through an intricate web of [*4]connections and cross-directorships that were instrumental to structuring the Project (compl ¶ 52). For example, Lin holds executive positions at Seabury Trade, SPC, Seabridge Holding, and Seabridge Trade and knew about the full scope and reality of the Project (see id. ¶ 53). Similarly, Chan was a member of top management at Seabury Capital, Seabury Group, Seabury Hong Kong, and SPC, served as both a direct supervisor to Lin, and acted as the ultimate decisionmaker in relation to the Project (see id. ¶ 54). As for Fong, who served as AIPL's COO, plaintiff maintains that he was instrumental in structuring AIPL's deals with the Approved Debtors while simultaneously serving as a director of Seabridge Trade (see id. ¶ 55). And regarding Jang, RiverTweed's sole director and shareholder, plaintiff asserts that he conspired with, among others, Lin and Chan to induce Arumdree to invest in the Project despite being aware of AIPL's financial troubles (see id. ¶¶ 57, 59; Jang aff ¶ 5).
Discussion
Plaintiff commenced this action on June 21, 2024, asserting claims under New York law for conspiracy to commit fraud, fraudulent inducement, fraudulent misrepresentation, and breach of fiduciary duty (see compl ¶¶ 60-86). Both the Seabury Defendants and RiverTweed Defendants now move to dismiss the Complaint primarily on the basis of forum non conveniens (see NYSCEF # 31 — Seabury MOL at 11-18; NYSCEF # 55 — RiverTweed MOL at 6-8; NYSCEF # 99 — Seabury Reply at 5-12). In support, defendants assert that every factor of the forum non conveniens analysis favors dismissal because (1) the transactions alleged in the Complaint all occurred abroad and largely involved foreign parties; (2) New York lacks an interest in this action given that Singapore is the epicenter of AIPL's alleged fraud; (3) key documents and essential witnesses are located outside of New York and outside of this court's subpoena power; and (4) Singapore is an adequate alternative forum to New York that is fully capable of resolving plaintiff's claims (Seabury MOL at 12-18; RiverTweed MOL at 7-8; Seabury Reply at 5-12).
Plaintiff fiercely contests that forum non conveniens is an appropriate basis for dismissal in its opposition (NYSCEF #s 83-84 — Opp). To start, plaintiff maintains that New York has the strongest nexus to this case because New York is purportedly the "control tower" of the alleged fraudulent scheme, meaning that it is "likely" that key witnesses and documentary evidence will be located in New York (id. at 12-19). Next, plaintiff contends that defendants have failed to identify an adequate alternative forum because litigating this case in Singapore or Korea would result in piecemeal litigation, and there is no guarantee that a Singaporean or Korean court would exercise jurisdiction over all defendants (id. at 19-21). At any rate, plaintiff continues, defendants will not suffer any hardship by litigating in New York because they are either financial companies or corporate officers with ample resources to bring witnesses to New York (id. at 21-23). Plaintiff then concludes that, because the alleged fraud involves New York companies, New York has an interest in adjudicating this dispute (id. at 23-24).
Pursuant to CPLR 327, which codifies the common-law doctrine of forum non conveniens, a court may "stay or dismiss [an] action in whole or in part on any conditions that may be just" if it finds that "in the interest of substantial justice the action should be heard in another forum" (CPLR 327 [a]; National Bank & Trust Co. of N. Am. v Banco De Vizcaya, 72 NY2d 1005, 1007 [1988] ["The doctrine of forum non conveniens permits a court to dismiss an action when, although it may have jurisdiction over a claim, the court determines that 'in the interest of substantial justice the action should be heard in another forum'"]). The doctrine reflects the basic principle that "our courts need not entertain causes of action lacking a [*5]substantial nexus with New York" (see Martin v Mieth, 35 NY2d 414, 418 [1974]).
To assess whether to retain jurisdiction under a forum non conveniens analysis, courts will consider and balance an array of factors (see Islamic Republic of Iran v Pahlavi, 62 NY2d 474, 479 [1984]). These include "(1) the burden on the New York courts; (2) potential hardship to the defendant; (3) the unavailability of an alternative forum in which plaintiff may bring suit; (4) whether both parties are nonresidents; and (5) whether the transaction from which the cause of action arose occurred primarily in a foreign jurisdiction" (Fekah v Baker Hughes Inc., 176 AD3d 527, 529 [1st Dept 2019]). No one factor is controlling, and it is ultimately defendants' "heavy burden" to demonstrate that they "militate against accepting the litigation" (Bank Hapoalim (Switzerland) Ltd. v Banca Intesa S.p.A., 26 AD3d 286, 287 [1st Dept 2006]). Nonetheless, where these factors plainly establish that New York is an inconvenient forum, "[f]orum non conveniens relief should be granted" (Silver v Great Am. Ins. Co., 29 NY2d 356, 361 [1972]).
Here, each of the forum non conveniens factors weighs in favor of dismissal.[FN7]
To start, nearly all of parties in this action are located outside of New York, with most located outside the United States (see compl ¶¶ 5-18). Indeed, plaintiff is a Korean trustee of certain private equity funds regulated by Korean law (see id. ¶ 5), and the vast majority of defendants are based in South Korea, California, Hong Kong, the Cayman Islands, and/or Singapore (see id. ¶¶ 9-15, 18; Lin aff ¶¶ 2-5, 14-15; Jang aff ¶¶ 4-5; Chan aff ¶ 2). This readily apparent pervasiveness of foreign residents "is entitled to . . . substantial weight" and plainly militates in favor of dismissal of this action (see Wyser-Pratte Mgt. Co., Inc. v Babcock Borsig AG., 23 AD3d 269, 270 [1st Dept 2005]). That three of the named defendants are purportedly based in New York does not alter this conclusion, especially where, as explained below, none of them appear to have played a meaningful role in the alleged fraudulent scheme (see Fernie v Wincrest Capital, Ltd., 177 AD3d 531, 532 [1st Dept 2019] [holding that "although there are some witnesses and evidence in New York, and one defendant is a New York resident, the court properly determined that New York is an inconvenient forum for this action"]; Wyser-Pratte, 23 AD3d at 270 [affirming dismissal on forum non conveniens grounds where "five of the nine defendants [were] German residents"]; BSR Fund, S.A. v Jagannath, 2020 WL 1274236, at *7 [Sup Ct, NY County, Mar. 17, 2020], affd 200 AD3d 554 [1st Dept 2021] [granting motion to dismiss on forum non conveniens grounds where all but one of the defendants were located outside of New York]).
Further supporting dismissal on forum non conveniens ground is the fact that the scheme alleged in the Complaint occurred primarily in foreign jurisdictions. According to the Complaint, defendants conspired to induce plaintiff to subscribe to the Notes without disclosing the dire [*6]financial condition of a AIPL and the fraudulent nature of the Project (see compl ¶¶ 28-31, 38-47, 63-66). Yet, as alleged, none of the key aspects of the Project or defendants' fraudulent scheme took place in New York (see generally id.; see also Lin aff ¶¶ 6-13; Chan aff ¶ 5; Jang aff ¶¶ 10-11).
For example, the Notes to which plaintiff subscribed were offered by a Cayman Island issuer, SPC, and the funds received from the Notes used to allegedly finance the acquisition of trade receivables from a Singaporean company, AIPL, that would then be managed by a Hong Kong-based company, Seabury Hong Kong (compl ¶¶ 31-35; Lin aff ¶¶ 6-13). Furthermore, the key meetings at which plaintiff's investment in AIPL was solicited and induced took place in Singapore and involved individuals from Korea, Singapore, and Hong Kong (see compl ¶ 24; Jang aff ¶ 10). Meanwhile, the purported communications in which the terms and structure of the Project occurred between co-conspirators who reside in Korea, Hong Kong, Singapore, and California (see compl ¶¶ 28, 53-57; Lin aff ¶ 6; Chan aff ¶ 5; Jang aff ¶ 11). Finally, plaintiff only learned about defendants' fraudulent scheme because it was an "extension of" fraudulent conduct by AIPL that came to light through bankruptcy proceedings and a criminal investigation in Singapore (compl ¶¶ 42-45). Taken together, these allegations establish that this case has no meaningful connection to New York. Rather, plaintiff's claims exhibit a "strong foreign nexus" that is "largely attributable to plaintiff's sophisticated business dealings abroad" (Wyser-Pratt Mgt., 23 AD3d at 270).
To avoid this conclusion, plaintiff argue that the court should find New York to be the "control tower" for the alleged fraudulent scheme. Specifically, plaintiff contends that Seabury Group and Seabury Capital—both of which are based in New York—served as a "nerve center" for their direct and indirect subsidiaries such as SPC, Seabury Trade, Seabury Hong Kong, Seabridge Trade and Seabridge Holding, such that the fraud perpetrated against plaintiff must have originated in New York (Opp at 12-14). Plaintiff's primary support for this "control tower" theory, however, appears to be its conclusory allegation that "Seabury" set up foreign shell corporations to perpetuate a fraudulent scheme originating in New York (see Opp at 12, citing compl ¶ 20). Not only is such reliance on conclusory allegations plainly insufficient to establish a New York connection in support of its claims (see Rafter v Newark Ins. Co., 37 AD2d 825, 825 [1st Dept 1971], affd 30 NY2d 819 [1972] [explaining that, to "meet the challenge as to his New York residence," plaintiff could "not rely on conclusory statements contained in his pleadings, whether verified or unverified"]), but the purported theory it supports is also at odds with plaintiff's original contention that Chan, presumably from her office in Los Angeles, was the "ultimate decision maker in relation to the Project" (see compl ¶¶ 14, 29, 54). As a result, plaintiff's reliance on this apparent corporate relationship between Seabury Group, Seabury Capital, and the other various entities named as defendants is insufficient establish the requisite nexus to New York necessary to survive forum non conveniens dismissal [FN8]
 (see Shin-Etsu Chem. [*7]Co., Ltd. v 3033 ICICI Bank Ltd., 9 AD3d 171, 176 [1st Dept 2004] [holding that there must "be some factual connection between New York and the dispute"]; cf. also Banco Nacional Ultramarino v Chan, 169 Misc 2d 182, 192 [Sup Ct, NY County, 1996], affd 240 AD2d 253 [1st Dept 1997] [denying forum non conveniens motion where plaintiff established that New York was "the hub of defendant's activities" by sufficiently "linking together [] the acts of various defendants like the hub of a wheel with many spokes"]).
As a consequence of this case's strong foreign nexus, it is likely that the majority of material witnesses, relevant documents, and other evidence in support of plaintiff's claims and defendants' defenses are located outside of the United States. For instance, all of the key misrepresentations and transactional details and logistics perpetuating defendants' fraud occurred in Singapore, Hong Kong, and/or Korea (see compl ¶¶ 24, 28, 34). And many of the relevant details regarding the fraud perpetrated by AIPL and defendants were only revealed from documents disclosed during court proceedings and criminal investigations that took place in Singapore (see id. ¶¶ 42-49; see also NYSCEF # 38 — Reza aff ¶¶ 15-17). The record before the court thus strongly suggests that the bulk of relevant documentary evidence will be located in Singapore and Hong Kong, and that key witnesses will be also located in those countries (and thus outside of the court's subpoena power). Consequently, even assuming, as plaintiff argues, some witnesses or documents may be in New York, litigating this action would almost certainly impose substantial burdens on defendants and nonparty witnesses so as to decidedly tip the scales in favor of dismissal (see Finance and Trading Ltd. v Rhodia S.A., 28 AD3d 346, 347 [1st Dept 2006] [affirming forum non conveniens dismissal where "majority of the relevant documents and witnesses would be French"]; Shin-Etsu, 9 AD3d at 177-178 [reversing denial of forum non conveniens motion where "[a]ny witness with personal knowledge of the letter of credit is located overseas"]; Cattan v Rohner, 2023 WL 2868337, at *5-6 [Sup Ct, NY County, April 10, 2023] [granting motion to dismiss on forum non conveniens grounds because, even though "some relevant witnesses or documents may be available in New York . . . the bulk of the witnesses and documents" were located in Switzerland]; see also In re Alcon Shareholder Litig., 719 F Supp 2d 263, 276 [SD NY 2010] [granting motion to dismiss on forum non conveniens grounds where, among other things, there was a "substantial risk that other key third-party witnesses, who reside in Switzerland or elsewhere in Europe, would not be within this Court's subpoena power" and documentary evidence was "largely in Switzerland"]).
Finally, although New York law does not require that the parties to identify an adequate alternative forum to support forum non conveniens dismissal, such a forum exists in Singapore and further supports dismissal of the case (see Pahlavi, 62 NY2d at 481 [explaining that the availability of another suitable forum is a "pertinent factor," but not a "precondition to dismissal"]). Critically, and as already explained, many of the claims in the Complaint directly flow from conduct and transactions that originated out of Singapore. Given this strong Singaporean nexus emanating from plaintiff's claims, the Seabury Defendants' Singapore [*8]counsel, Mohammed Reza, opines in his affirmation that it is likely that a Singapore court would be able to exercise personal jurisdiction over most, if not all, of the defendants (see Reza aff ¶¶ 18-25 ["Singapore courts will typically permit service of process on nondomiciliaries and assert jurisdiction over parties who carry on business or who have property in Singapore, where the causes of action arise from transactions in Singapore, torts committed in Singapore, or if the plaintiff suffered damage in Singapore"]). In response, plaintiff merely speculates that "there is no guarantee that a Singapore court can exercise personal jurisdiction" over all defendants (Opp at 19). But such speculation, without any other support, fails to plausibly establish how, if at all, Singapore would be an inadequate alternative to New York (see Flame S.A. v Worldlink Intl. (Holding) Ltd., 107 AD3d 436, 438 [1st Dept 2013] ["the burden of demonstrating that [no alternative forum is available] . . . fall[s] on plaintiff" [alterations in original]]).
The fact that the Singaporean legal system is primarily derived from the English system and incorporates English common law further supports a conclusion that Singapore is an adequate alternative forum for this dispute (see Reza aff ¶¶ 26-27; NYSCEF # 47). Significantly, plaintiff's acquisition of the Notes was made pursuant to a Subscription Agreement between SPC and plaintiff (compl ¶¶ 31-32). That Subscription Agreement, in turn, provides that the agreement and "any non-contractual obligations arising out of or in connection with" the agreement would be "governed by" and "construed in accordance with" English law (see NYSCEF # 37 § 12.1). Because case law in New York suggests that this type of language used in the Subscription Agreement's choice-of-law provision is generally to be construed broadly to reach tort claims, it appears that all of plaintiff's claims should be governed by English law and not, as asserted, New York law (see Matter of Schachter (Witte & Co.), 52 AD2d 121, 123 [1st Dept 1976], affd 41 NY2d 1067 [1977] [determining that the phrase "[i]f any disagreement arises under this agreement" was almost identical with the phrase "all disputes arising out of the contract," and therefore broad enough to include claims of fraud]; Triple Z Postal Servs., Inc. v United Parcel Serv., Inc., 13 Misc 3d 1241[A], at * [Sup Ct, NY County, 2006] [holding that forum selection clause that designated California as the "[e]xclusive venue and jurisdiction of any suit arising hereunder" was "broad" and encompassed "tort claims that arose in the context of the parties' contractual relationship"]). It follows then that a court in Singapore would be more than capable of overseeing the parties' dispute given its familiarity with English common law and the English legal system. By contrast, New York courts regularly dismiss actions that may require the interpretation of foreign laws, including where, as here, a more convenient forum exists and dismissal would avoid an "inordinate burden upon New York's courts" (see Tilleke & Gibbins Intl., Ltd. v Baker & McKenzie, 302 AD2d 328, 329 [1st Dept 2003] [holding that dismissal on forum non conveniens grounds was proper where "permitting the action, involving numerous Thai witnesses and documents, as well as Thai law, to proceed in New York would, given the availability of the substantially more convenient Thai forum, have resulted in the imposition of an inordinate burden upon New York's courts"]; see also Pahlavi, 62 NY2d at 480 [holding that the "likely applicability of Iranian law" supports dismissal on forum non conveniens grounds]).
In sum, consideration of each of the forum non conveniens factors establishes that plaintiff's lawsuit lacks a "substantial" nexus to New York, and as a consequence, dismissal of the Complaint is appropriate. Therefore, defendants' motions to dismiss on forum non conveniens grounds are granted and the Complaint is dismissed as against all remaining defendants to this action.
* * *
Because the court has dismissed the Complaint, the Seabury Defendants request that the court direct plaintiff to pay all costs and expenses incurred in bringing defendants' motions, including attorneys' fees, which they maintain are available under English law (Seabury MOL at 39; Seabury Reply at 23-24). In support of this request, the Seabury Defendants submit an affirmation by Steven Anthony Kaye, a partner in the Singapore office of Simmons & Simmons who is admitted to practice law in England & Wales, to opine on the contours of English law on this issue (NSYCEF # 48). As Kaye states, in England, "costs follow the event," meaning the unsuccessful party is required to pay the successful party's costs (id. ¶ 7). Kaye, however, concedes that it is ultimately in the court's discretion to decide if one party is entitled to recover costs from another and the amount to be recovered (id. ¶¶ 6-8; NYSCEF # 51 at 2-3 ["(1) The court has discretion as to [] whether costs are payable by one party to another . . . .]]). And although Kaye asserts that courts in England have considered a defendant a "successful party" in the context of a dismissal of a claim for lack of jurisdiction or on forum non conveniens grounds, he cites no authority for this point (see NYSCEF # 48 ¶ 8).[FN9]

Accordingly, upon consideration of the Seabury Defendants' submissions on the issue of costs and expenses under English law, the court declines to grant defendants' application for attorneys' fees notwithstanding their success in dismissing the Complaint on forum non conveniens grounds (cf. generally Dattner v Conagra Foods, Inc., 458 F 3d 98, 103-104 [2d Cir 2006] [observing that "a defendant who successfully obtains a dismissal on forum non conveniens grounds is not a 'prevailing party' entitled to costs under [Federal Rule of Civil Procedure] 54(d)," which provides that "costs other than attorneys' fees shall be allowed as of course to the prevailing party unless the court otherwise directs"]).
Conclusion
For the foregoing reasons, it is hereby
ORDERED that defendants' motions to dismiss pursuant to CPLR 327(a) (MS002 + MS003) are granted and the complaint is dismissed in its entirety against all remaining defendants; and it is further
ORDERED that the Clerk of the Court shall enter judgment accordingly; and it is further
ORDERED that counsel for defendants are directed to serve a copy of this order, together with notice of entry, upon plaintiff and the Clerk of the Court within 10 days of this order.
DATE 07/14/2025
MARGARET A. CHAN, J.S.C.

Footnotes

Footnote 1:By notice, dated October 15, 2024, plaintiff discontinued this action against defendants Fong Ngan Seng and Glenn Goh (see NYSCEF # 28)

Footnote 2:The following facts
are drawn from the Complaint and the affirmations and exhibits submitted by the parties. These facts are accepted as true solely for purpose of this motion.

Footnote 3:Lin is also a director for defendant SPC (see Lin aff ¶ 1).

Footnote 4:According to Lin, SPC would have used proceeds from the insurance to pay plaintiff the amounts due on the Notes, meaning that plaintiff was the ultimate beneficiary (NYSCEF # 90 ¶ 8)

Footnote 5:The Complaint defines the term "Seabury" as encompassing defendants Seabury Group, Seabury Capital, Seabury Trade, SPC, and Seabury Hong (compl at 1), and at various points in the Complaint, plaintiff refers to "Seabury" as taking certain actions and/or making certain communications targeted at plaintiff. Plaintiff, however, never indicates which of those entities encompassed within the definition of "Seabury" is specifically speaking or taking a particular action (see, e.g., id. ¶¶ 24, 32, 38, 40, 46, 51).

Footnote 6:Seabridge Trade is a wholly owned subsidiary of Seabridge Holding, which is also incorporated in Singapore (compl ¶¶ 11-12).

Footnote 7:The court may address forum non conveniens without first resolving any outstanding personal jurisdiction issues that may exist (see Estate of Kainer v UBS AG, 37 NY3d 460, 466-467 [2021] ["We did not hold in Ehrlich-Bober that a court invariably must resolve any outstanding personal jurisdiction issue prior to addressing forum non conveniens, decline to adopt such a rule in this case, and conclude that the court here did not abuse its discretion in that regard"]; EPK Brand, Inc. v Leret, 194 AD3d 644, 645 [1st Dept 2021] ["the court properly addressed the forum non conveniens issue without first determining the issue of personal jurisdiction over all defendants, given the burdensome inquiry involved in determining personal jurisdiction under these circumstances, and the balance of the forum non conveniens considerations"]).

Footnote 8:As another basis to establish that New York is a "control tower," plaintiff also asks the court to focus on certain details purportedly revealing the "intricate web of connections and cross-directorships" among defendants (see Opp at 12-14). This includes, among others, Lin's representation that Seabury Trade "has no paid employees" and "exists to hold an interest in Seabury Hong Kong" (see Lin aff ¶¶ 2-3), Jang's representation that he is the "sole shareholder," "sole director," and "sole employee" of RiverTweed (see Jang aff ¶ 5), and the apparent value of Seabury Hong Kong being just $1 Hong Kong Dollar (see NYSCEF # 67 at 2). This alternative basis to establish a New York nexus is unavailing. Even assuming, without deciding, that these facts support plaintiff's conspiracy claim against defendants, they fail to support a conclusion or reasonable inference that New York—as opposed to one of the other foreign jurisdictions identified in the Complaint—served as the "control tower" for defendants' fraud.

Footnote 9:Mr. Kaye does cite to Merck KGaA v Merck Sharp & Dohme Corp.& Others, Case No. HC13B00955, in this portion of his affirmation, but that decision only indicates that the court's order on costs was being made following the court's "judgment on the preliminary issue this morning" (NSYCEF # 50 ¶ 1). Notably, the court did not identify the nature of this "preliminary issue" (id.).